**Lon Kieferdorf LANE, Appellant,**

v.

**STATE of Texas, Appellee.**

**No. 11–01–00343–CR.**

Court of Appeals of Texas, Eastland.

June 5, 2003.

---

John D. Nation, Dallas, for appellant.

Bill Hill, Dist. Atty., Criminal Dist. Attorney–Appellate Section, Dallas, for appellee.

Panel consists of: ARNOT, C.J., and McCALL, J., and DICKENSON, S.J.*

### Opinion

BOB DICKENSON, Senior Justice (Retired).

The jury convicted Lon Kieferdorf Lane of the aggravated assault of Cindy Lane,

his wife. After a presentence investigation, the trial court assessed appellant's punishment at confinement for 35 years. We affirm.

### The Indictment

The indictment charged that on or about January 20, 2001, appellant intentionally, knowingly, and recklessly caused bodily injury[1] to Cindy Lane by striking her with his hand and by kicking her with his foot and that appellant "did use and exhibit a deadly weapon [his hand and foot] during the commission of the assault." The indictment also alleged that appellant had two prior felony convictions, an aggravated robbery conviction in 1992 and a robbery conviction in 1990.[2]

### Relevant Testimony

There is no dispute that appellant and his wife were at home by themselves when she was injured; that appellant called "9–1–1" for assistance; and that appellant's wife was taken to the hospital by ambulance. The main dispute at the time of trial was whether appellant's wife was telling the truth when she said that appellant hit her and kicked her or whether she was telling the truth when she said that she fell down the stairs and hurt herself.

Greg Minter of the Garland Fire Department testified that he was working as a paramedic on January 20, 2001, at 12:45 a.m., when he was sent to a residence at 323 Valley Park in Garland. An engine crew from a different station was already there, and the paramedic from that crew

---

* Bob Dickenson, Retired Justice, Court of Appeals, 11th District of Texas at Eastland sitting by assignment.

1. The indictment also charged that appellant caused "serious bodily injury" to Cindy Lane by striking her with his hand and by kicking her with his foot.

2. Since appellant pleaded "true" to both allegations, TEX. PENAL CODE ANN. § 12.42(d) (Vernon 2003) provides that the range of punishment is confinement for not less than 25 years to not more than 99 years or life.

had begun the care of the patient before Minter arrived. Minter was "briefed" on what had been done before he arrived. Minter said that he rode in the back of the ambulance with the patient on the way to the hospital. Relevant portions of Minter's testimony during direct examination by the prosecutor read as shown:

Q: Now, once you get a person into the back of the ambulance and then are transporting them, do you have a certain procedure or protocol? I mean if you put somebody in your ambulance, what do you do with them?

A: The type of injury dictates what I do, my protocol. In her case it was— told me that this was from a fall possibly down some stairs. So you're looking at traumatic injury. I asked the patient [appellant's wife] what was wrong with her. She was complaining of right-sided head pain and right-sided chest pain.

Q: Did she appear to be in a lot of pain to you?

A: She was. She did appear to be in quite a bit of pain.

\* \* \*

Q: And as part of your duties as a paramedic, is it necessary for you to ask a person what happened to them in order to make a medical diagnosis for treatment?

A: Sure. We need to know the events that caused the injury, you know, in detail to help us treat her and also when we give information to the hospital.

[After appellant made a "hearsay" objection under TEX.R.EVID. 802 to the State's question about the response by appellant's wife, the State urged two exceptions to that rule: (1) statements under TEX.R.EVID. 803(4) which are made for the purpose of medical diagnosis or treatment and (2) statements un-der TEX.R.EVID. 803(2) which are "excited utterances."]

THE COURT: Overruled.

Q: What did she say had happened to her, sir?

A: Initially she didn't answer me. She was upset and crying. I pursued it, asked her again, because that's something we need to know. And that's when *she informed me that she was hit by her husband.* (Emphasis added)

When asked to explain what he meant when he said that he "pursued it," Minter explained that he told his patient that he needed to know what had happened in order to help her and that he asked her "how far down the steps" she had fallen and "how many steps" she had hit. Minter identified the "emergency medical services" report which he prepared, and a redacted copy of that report was admitted into evidence. That report showed that the patient was vomiting and nauseated while en route to the hospital, that she had tenderness to the right chest and right rib region, that she had pain in the occipital region, and that she said that "her husband had hit her." Minter also testified that a fist hitting a person's head could be capable of causing serious bodily injury. On cross-examination, Minter agreed that the patient told the first paramedic that she had "fallen down the stairs." This was the information which had been passed on to him by the first paramedic. Minter also agreed with appellant's attorney that the patient did not have any "obvious deformities" and that she was rational when he talked to her.

Ralph Autrey testified that he was a registered nurse, that he had 21 years experience, and that he was working in the emergency room at the Garland hospital when Cindy was brought to the hospital by ambulance. Nurse Autrey said that this

patient came to the emergency room at 1:25 a.m. on January 20 and that he did the nursing assessment on her. After the hearsay objection was overruled, Nurse Autrey said that the patient told him that *"she was assaulted by her husband."* (Emphasis added) Nurse Autrey also testified that his notes do not show anything about her "having fallen down any stairs." The nursing notes also show that she had contusions to the right side of her head, that she had old bruises on her breast, that she was tender in the gastric region, and that she complained of pain in the lumbar region of her back. Nurse Autrey said that his notes showed that she was "awake, alert, [and] oriented to date, time and place." Nurse Autrey also testified that a "blow from a fist" was capable of causing serious bodily injury if it is hard enough and in the right location. On cross-examination, Nurse Autrey agreed that he did not find any broken bones, that he did not document any bleeding or bloody areas, that the patient's vital signs were stable, that he did not see any permanent disfigurement, and that there did not appear to be any life-threatening injuries.

Officer Shawn Roten of the Garland Police Department testified that the dispatcher sent him and Officer Scott William Lichtenberg to the Baylor Garland Hospital on January 20, 2001, at 1:32 a.m. to see a female in the emergency room who "was alleging an assault had occurred." Officer Roten said that Cindy was in the emergency room, that she was in bed, that it was a private area, that the nurse may have been in and out, but that the two officers and Cindy were the only other ones in the room. Officer Roten said that Cindy "looked like she was in pain," that she was "not moving much, moaning a little," and that her "eyes were watery." Officer Roten said that they determined that the cause of the pain was within an hour of the time they arrived and that Cindy was still suffering from the pain. After a hearsay objection, the officer asked her why she had not reported the assault immediately. Relevant portions of his testimony read as shown:

Q: What was her response?

A: She figured that her husband may kill her if she reported the assault.

[After another hearsay objection was overruled on the basis of the excited utterance exception, the testimony continued.]

Q: Officer, what specifically did she tell you had happened, how she suffered her injuries?

A: Her and her husband Lon Lane had an argument. She was sitting on the sofa. *He struck her several times with a closed fist to the back of her head and then once to the right side of her forehead area. She fell out of her chair, at which point he kicked her in the stomach and the back.* (Emphasis added)

Officer Roten said that, when he asked her why she had told the paramedics that she had fallen on the stairs, she said that she was "afraid that her husband would kill her" if she had told them what had happened. Officer Roten identified the photograph which was taken and which showed the way appellant's wife looked that night. Officer Roten also testified that appellant's wife was "very rational and very coherent with her responses" when they talked to her. Officer Roten also testified that the hands and feet can be used as deadly weapons if the victim is hit on the head or kicked in the back or chest. Officer Roten also identified appellant as the man that they arrested after talking to his wife in the emergency room.

Officer Scott William Lichtenberg of the Garland Police Department testified that

he was working with Officer Roten on January 20, 2001, when they investigated a family violence assault. Officer Lichtenberg testified that appellant's wife appeared to be "emotionally rattled," that her voice was "very timid and slow," that she appeared to be "in a lot of pain and a lot of stress," and that she had some visible injuries. Officer Lichtenberg testified that Officer Roten conducted the interview and that he observed the interview. Relevant portions of his testimony on direct examination by the prosecutor read as shown:

Q: Specifically then will you tell the jury what did [appellant's wife] say was the source of her injuries?

[DEFENSE COUNSEL]: Objection. Hearsay.

[PROSECUTOR]: Offer this under the excited utterance exception, Your Honor.

THE COURT: Overruled.

Q: Specifically, how did she say that she received these injuries?

A: [Appellant's wife] stated to us that the *defendant had struck her with his fist on the back of her head and on the side of her head causing her to fall out of a chair in which she was seated in. Once she went to the ground, she stated that he then kicked her with his feet in the lower back and then in the chest area.*

Q: Did she report whether or not she had lost consciousness?

A: She did state that she lost consciousness sometime after that.

Q: Did you ask her—did she say anything about having received any injuries from falling down stairs?

A: No, ma'am.

Q: Did you ask her about that, whether or not that had been—that report had been made earlier?

A: I believe Officer Roten asked her about that.

Q: What was her response to that, if you recall?

A: She stated that she told other people that because she was fearful of repercussions or reprisal from her husband. (Emphasis added)

Officer Lichtenberg testified that he made the decision to arrest appellant and that he participated in that arrest. He identified appellant in open court as the man who was arrested. Officer Lichtenberg also testified that it was not unusual for individuals who are fearful of retaliation to first tell one story, then tell a different story when they are separated from the person, and then change their story again later. He said this is particularly true in areas of family violence. He also testified that police officers are taught not to hit people in the head or around the spine because blows to those areas can be potentially damaging. He also said that the hands and feet can be used to cause serious bodily injury. Officer Lichtenberg reviewed the offense report and said that it showed that appellant's wife said that appellant hit her in the head "with a closed fist" and that she had been "kicked in the lower back and in the chest" by appellant's foot.

Investigator Kelly Brasher of the Garland Police Department identified the pictures which she took of appellant's wife in the emergency room.

After the State rested, the court overruled appellant's motion for a directed verdict. Then appellant's wife and mother testified in his behalf. Appellant did not testify.

Anna Lane, appellant's mother, testified that she went to appellant's house on January 20 after he called her on the telephone. Anna testified that Cindy was lying

on the floor, that Cindy said that she had fallen, and that Cindy said that her head was hurting. Anna went to the store to purchase some aspirins for Cindy, and appellant called the paramedics after Anna got back from the store. Anna went to the hospital in her own car after the ambulance took Cindy to the hospital. During cross-examination by the prosecutor, Anna said that appellant told her that Cindy "fell down the stairs" when he called her to come over to their house.

Cindy testified that she was married to appellant and that they had been arguing on the evening that she was injured because she thought he was "cheating" on her. She said that it was a "heated argument." Relevant portions of her testimony on direct examination by appellant's attorney read as shown:

Q: Did you at any time strike him?

A: No, I didn't strike him.

Q: And did he at any time strike you?

A: No, he never struck me.

Q: *And the injuries that you received . . . how did you get those?*

A: *When I stormed out of the room and ran down the stairs and took the stairs a little bit too swiftly, I missed my step. We have a bannister that juts out. It's like a wrought iron bannister. And I tumbled down the stairs and hit that as I went down the stairs.* (Emphasis added)

Cindy also testified that she and appellant own a two-story town home and that they were upstairs when the argument started. Cindy said that it was close to midnight, that they were dressed for bed, and that appellant was not wearing shoes. Cindy said that she missed one of the top steps when she "stormed out of the bedroom" and ran down the hallway to the stairs. Cindy said that she fell from the very top of the circular stairway and that she landed on the floor in the foyer by the dining room. Cindy said that appellant wanted to call "9-1-1" but that she told him to call his mother. Cindy said that she had a "pretty close relationship" with appellant's mother. Cindy said that Anna got there very quickly and that Cindy asked Anna to get her some Tylenol or aspirin. Cindy said that appellant was worried about her and that he called "9-1-1" for assistance. Cindy testified that, when the paramedics got there, she told them that she had fallen down the stairs. Cindy said that they put her on a stretcher and then put her in an ambulance. Relevant portions of her testimony on direct examination read as shown:

Q: And then on the way to the hospital you had a conversation with one of the paramedics in the back?

A: Right.

Q: And what did you tell that paramedic in the back?

A: By that time a little time had passed, and I had grown angrier and angrier. And I told him that my husband had did it to me.

Q: What did you tell him? Did you tell him that your husband pushed you down the stairs or what?

A: I told him that he beat me up. I told him that he hit me and that he kicked me and beat me up. And he didn't. I was just so angry.

Q: Why did you lie to them, Ms. Lane?

A: I just wanted him to hurt like I was hurting. I'm sorry. I never thought it would get this far. . . . I wasn't thinking correctly. I was dazed. I was shook up. I never thought this would happen. And I kept asking for them— right after it happened—I mean, every time I talked to the DA's Office I asked them to drop charges, everything.

* * *

Q: And you told that story again to the police at the hospital?

A: Yes. When they came and they asked me, I told them that's what happened; that he had beat me up. Because I saw it as a perfect opportunity. It just fell into place.

* * *

Q: Have you—all since reconciled?

A: Yes.

Q: Have you found out who that number belonged to that you found [and which caused her to think appellant was "cheating" on her]?

A: Yes, and that's the most embarrassing part, because I was so wrong.

* * *

Q: What about the fact that you indicated during your conversation with the police that you were fearful that he was going to kill you?

A: Of course I was going to say that. I was mad. I wanted to tell them anything to hurt him. I was jealous. I was insecure. I was very angry.

* * *

Q: And you know it doesn't really look good that you're changing your stories?

A: I realize that.

Q: And so the question could be asked, Ms. Lane, that if you lied at one time, what would make this court and this jury not think that you're not lying today?

A: Because I'm not mad right now. I'm just regretful that I was so mad that night and regretful that I didn't tell the truth that night. Because I never thought this would happen. And anger makes you say things and jealousy makes you say really horrible things that you don't mean.

During her cross-examination by the prosecutor, Cindy reviewed the statement which she gave to the police on February 6, 2001. In that statement, she claimed that she fell down the stairs and that she gave the other version because she was "in a haze and not being able to think clearly." In that statement, she claimed that she had a concussion and that she "blacked out twice" while waiting for the paramedics after her husband called "9–1–1." Also, she did not mention anything in that statement about anger or infidelity.

### Points of Error

Appellant presents only two points of error. Appellant argues in his first point that the evidence is "legally" insufficient. Appellant argues in his second point that the trial court erred in admitting evidence of hearsay statements by the complaining witness.

### Sufficiency of the Evidence

Appellant's claim that the evidence was "legally" insufficient has been reviewed under the test stated in *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). See also *Vasquez v. State,* 67 S.W.3d 229, 236 (Tex.Cr.App. 2002). The jury was the "exclusive judge of the credibility of the witnesses," and the reconciliation of conflicts in the testimony is within the "exclusive province of the jury." TEX. CODE CRIM. PRO. ANN. arts. 36.13 & 38.04 (Vernon 1979 & 1981); *Jones v. State,* 944 S.W.2d 642, 647 (Tex. Cr.App.1996), *cert. den'd,* 522 U.S. 832, 118 S.Ct. 100, 139 L.Ed.2d 54 (1997).

While we agree with appellant that the evidence does not show that appellant caused "serious bodily injury" to his wife, that is not the end of our inquiry. TEX.

PENAL CODE ANN. § 22.02 (Vernon 2003) provides that a person can commit the offense of "aggravated assault" in two different ways. Under Section 22.02(a)(1), the offense is committed if the person commits an assault and "causes serious bodily injury to another." Under Section 22.02(a)(2), the offense is committed if the person commits an assault and "uses or exhibits a deadly weapon during the commission of the assault." Section 22.02(a)(2) does not require proof of a "serious bodily injury"; it only requires proof of a "bodily injury." See TEX. PENAL CODE ANN. § 22.01 (Vernon 2003). The jury was authorized to convict appellant of aggravated assault if it found that he caused "bodily injury" to his wife while using his hand or foot as a deadly weapon.

See *Clark v. State*, 886 S.W.2d 844 (Tex. App.-Eastland 1994, no pet'n), where this court held that the acquittal of causing "serious bodily injury" was not inconsistent with an affirmative "deadly weapon" finding. This court said:

> To support a deadly weapon finding, the State must show that appellant's hands or feet *in the manner of their use or intended use were capable of causing death or serious bodily injury.* TEX. PENAL CODE ANN. § 1.07(a)(17)(B) (Vernon 1994). *The State need not show that the hands or feet actually did cause serious bodily injury....* Furthermore, a showing that the defendant used his hands or feet in a manner capable of causing serious bodily injury, *even absent the intent to do so, will support a deadly weapon finding.* (Emphasis added)

*Clark v. State*, supra at 845; see also *Jefferson v. State*, 974 S.W.2d 887, 892 (Tex.App.-Austin 1998, no pet'n). The first point of error is overruled.

*The Hearsay Objections*

The trial court did not err in overruling appellant's "hearsay objections." In *Zuliani v. State*, 97 S.W.3d 589, 595 (Tex.Cr. App.2003), the court discussed the admissibility of out-of-court statements under "the exceptions to the general hearsay exclusion rule." The court said in *Zuliani* that the admissibility of these statements is "within the trial court's discretion" and that the appellate courts should not reverse a discretionary ruling "unless a clear abuse of discretion is shown." The court in *Zuliani* then pointed out that such an abuse of discretion is not shown unless the trial court's ruling "was so clearly wrong as to lie outside the zone within which reasonable persons might disagree." See also *Coffin v. State*, 885 S.W.2d 140, 149 (Tex.Cr.App.1994); *Cantu v. State*, 842 S.W.2d 667, 682 (Tex.Cr.App.1992), *cert. den'd*, 509 U.S. 926, 113 S.Ct. 3046, 125 L.Ed.2d 731 (1993).

The court in *Zuliani v. State*, supra at 595–96, discussed an "excited utterance" under TEX.R.EVID. 803(2) ("A statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition"). The court explained that the basis for this exception is "psychological," noting that a person who is in the instant grip of violent emotion, excitement, or pain ordinarily loses the capacity for reflection necessary to the fabrication of a falsehood and that, consequently, the "truth will come out." The court then said:

> [T]he statement is trustworthy because it represents an event speaking through the person rather than the person speaking about the event.

In determining whether a hearsay statement is admissible as an excited utterance, the court may consider the time elapsed and whether the statement

was in response to a question. However, it is not dispositive that the statement is an answer to a question or that it was separated by a period of time from the startling event; these are simply factors to consider in determining whether the statement is admissible under the excited utterance hearsay exception.

The critical determination is "whether the declarant was still dominated by the emotions, excitement, fear, or pain of the event" or condition at the time of the statement. Stated differently, a reviewing court must determine whether the statement was made "under such circumstances as would reasonably show that it resulted from impulse rather than reason and reflection." (Citations omitted)

■ The evidence supports the trial court's ruling that the statements made to the medical personnel and to the police officers on the night of the offense were admissible as "excited utterances" under Rule 803(2). Moreover, the statements to the medical personnel were also admissible under Rule 803(4) because they were pertinent to the diagnosis and treatment of appellant's wife. The second point of error is overruled.

*This Court's Ruling*

The judgment of the trial court is affirmed.