NO. 07-08-0386-CR

IN THE COURT OF APPEALS

FOR THE SEVENTH DISTRICT OF TEXAS

AT AMARILLO

PANEL C

SEPTEMBER 30, 2009

_____

GARRICK D. QUINCY, APPELLANT

V.

THE STATE OF TEXAS, APPELLEE

_____

FROM THE 137TH DISTRICT COURT OF LUBBOCK COUNTY;

NO. 2007-418,403; HONORABLE CECIL PURYEAR, JUDGE

_____

Before QUINN, C.J., and HANCOCK and PIRTLE, JJ.

**OPINION**

Appellant, Garrick D. Quincy, was convicted by a jury of the offense of aggravated sexual assault[1] and sentenced to twenty-four years confinement. By two issues, Appellant contests: (1) the legal and factual sufficiency of the evidence and (2) whether the trial

---

[1]Tex. Penal Code Ann. § 22.021 (Vernon Supp. 2008). For convenience, provisions of the Penal Code will be cited throughout this opinion simply as "section ____" or "§ ____."

court erred in allowing the admission of extraneous offense evidence that was irrelevant and prejudicial.  We affirm.

**Background**

By a three count indictment, Appellant was charged with the aggravated sexual assault of his girlfriend, Erica Flores.  The indictment alleged that on or about November 11, 2007, in Lubbock County, Texas, Appellant intentionally and knowingly caused the penetration of: (1) the anus of the victim, by defendant's finger; (2) the anus of the victim by defendant's penis; and (3) the female sexual organ of the victim by defendant's penis, without her consent, and Appellant, did then and there compel the victim, to submit by the use of physical force or violence, and in the course of the same criminal episode, defendant caused serious bodily injury to the victim, by striking her with his hand, and did then and there use and exhibit a deadly weapon, to-wit: hands, that in the manner of its use and intended use was capable of causing death and serious bodily injury.[2]

Prior to trial, the State filed notice that it intended to offer evidence of other crimes, wrongs, or acts against the victim during the guilt/innocence phase of the trial.[3] Specifically, the State gave notice that it intended to use "[a]ny and all contextual evidence relating to the causes as alleged in the above–named indictment."  The State later elected

---

[2]§ 22.021 (a)(1)(A)(i) & (iii), (2)(A)(i)-(iv).

[3]Tex. Code Crim. Proc. Ann. art 38.37 §§ 1(1), 2(2), 3 (Vernon Supp. 2008).

2

to proceed only on Count 1 (penetration of the victim's anus by Appellant's finger) of the indictment.

At trial, Erica's sister, testified that, on the evening of November 10, 2007, Erica, her two-year old son, and Appellant, were eating and drinking at her house. At approximately 2:00 a.m., Erica and her son left with Appellant. Throughout the next day, she frequently telephoned Erica, but received no answer. At approximately 5:30 p.m., Erica called. She was crying, upset, and asked her sister to meet her at Covenant Hospital. When she arrived, Erica was scared and had a deep, bleeding cut on her head.

Erica testified that, on November 11, 2007, Appellant had been her boyfriend for nearly a year. He was bigger and taller than her. On that day, she and her son stayed at the apartment where Appellant was living with his mother, brother, and his brother's friend. When they awoke around 11:00 a.m., no one else was in the apartment. Erica testified that Appellant became angry when she attempted to talk to him about ending their relationship. When Erica went to the kitchen, Appellant followed her, wanting a reason why she didn't want to be with him. At some point, Appellant put his hand on Erica's throat and she protested. He removed his hand and said he wouldn't do it again. Erica became scared because Appellant had a bad temper.[4]

---

[4]Testimony revealed Appellant had physically abused Erica in the past.

3

According to Erica's testimony, Appellant turned as though he were leaving the kitchen when suddenly he turned again and struck her head with his fist. She fell backwards and landed in the pantry. He continued hitting her with his fist. First, on the back of her head and then in the back. When she rose to her feet, she was bleeding from her head. As she bent over the kitchen sink and attempted to stop the bleeding, Appellant came up from behind her, pulled her pants and underwear down, and inserted his finger into her anus.

Erica was afraid to leave–frightened for herself and her son. She knew she wouldn't be able to leave the apartment until she convinced Appellant that she would not report the incident. Her head had almost stopped bleeding when she followed Appellant to his bedroom. At the time, Appellant had a box cutter in his hand. He told her that he hated her and didn't care about her anymore. Although she tried to calm him down, he rammed his head into the bedroom wall making a hole. He used the box cutter to slice a five dollar bill, illustrating its sharpness.

Although her phone rang constantly, she did not answer because she was afraid of what Appellant might do if she told anyone what was happening. At some point, Appellant told her to stand up. Erica complied and he then pulled her pants and underwear down and turned her over. He forced her to lie on the bed while he attempted to penetrate her anus, this time with his penis.

About 3:00 p.m., Appellant's sister, her children, and his mother returned to the apartment. His mother started yelling about the blood on the kitchen floor. When his mother saw blood all over Erica's clothes, she indicated she was calling the police and told Appellant that he needed "to let that girl go home." Appellant walked towards Erica with his fist balled up and said, "Don't think just because they are here I won't do anything." He told her to lie at the hospital and tell them she fell and hit her head.

Erica testified that about two hours had elapsed between the time she was assaulted at the kitchen sink and when he placed her on the bed in his room. She testified she was unable to leave the apartment to go to the hospital until she told him she would lie to hospital personnel about what had occurred. Before she left, Appellant had her change her shirt and told her, that if she told the truth at the hospital, "she would have to go to Women's Protective Services."

At approximately 4:47 p.m., Officer Karen Findley of the Lubbock Police Department was dispatched to Covenant Hospital where she met Erica. Officer Findley described her as small, frail, crying, and upset. Erica told her that her boyfriend had caused her injuries between noon and 4:00 p.m. at the apartment where he lived. Erica had a large cut that was broken open on her head, she complained of pain in her head, thighs, anal area, mid-section, and lower abdomen. Officer Findley could see inside Erica's head through the opening. There was visible bruising on the upper right portion of her collarbone area.

5

Officer Findley opined that Erica's head injury was consistent with being struck in the head with a fist.

At approximately 8:30 p.m., Officer Findley placed Appellant in custody at his mother's apartment. She observed Appellant's knuckles on his right hand were swollen. After advising Appellant of his *Miranda* rights, she asked him how Erica received the laceration on her head. Appellant indicated she had gotten drunk the previous night, fell down, and hit her head.[5] When Officer Findley described the fresh blood on Erica's head wound at the hospital, Appellant indicated he just woke up and her head was "like that." He also explained his knuckles were swollen because he punched a wall several days earlier. While Officer Findley was in the apartment, she observed that the kitchen area appeared to have been cleaned.

Donna Neel, sexual assault nurse examiner, assisted with Erica's treatment at the hospital. She described Erica's head wound as a significant, gaping wound with old and active bleeding. Erica's scalp was split open, five millimeters by one millimeter and required fourteen staples to close. She opined that Erica's injury could lead to scarring and permanent disfigurement. She stated that Erica's account of what occurred that day at Appellant's apartment was consistent with her physical examination and injuries. She also opined that Erica's bruising was consistent with being punched, choked, and grabbed around the collarbone. A large bruise near Erica's collarbone containing small bruises

---

[5]Prior to questioning, Appellant voluntarily waived his rights. Appellant does not contest whether his statements were voluntary.

inside was consistent with being choked. Erica's right arm and the area below the left knee were bruised indicating a struggle and/or fight, and she bore corresponding scratches on each of her hip bones. There were four tears in the area of her anal opening that appeared fresh, *i.e.,* as having occurred that day between noon forward. Although she could not say with certainty, she testified the tears were consistent with the use of force and/or friction during penetration using a finger or penis into her anus. She testified Erica's history of sexual assault occurring that day and the penetration of her anus against her will was consistent with the injuries she observed.

Detective Tracy Taylor of the Lubbock Police Department testified he compared three statements given by Erica to: (1) Officer Oliver at the emergency room, (2) Nurse Neel an hour or so later at the hospital, and (3) to him two days after her visit to the emergency room. He testified all three statements were consistent. Having reviewed Erica's statements, photographs of her injuries, and Neel's SANE examination, he opined that Erica's head wound qualified as a serious bodily injury. He also testified that hands could be used as a deadly weapon and opined that, particularly considering their size difference, Appellant used his hands as a deadly weapon when he assaulted Erica.

Lawrence Flores, Appellant's brother, testified for the defense. He indicated that, on the morning of November 11, when he awoke around 10:00 a.m., he heard someone moaning and a noise coming from Appellant's room like furniture scratching against the wall. Later, at about 11:00 a.m., he observed Erica leaving Appellant's bedroom. When

7

she saw him, she said, "Good morning." When he left the apartment for work at approximately 1:00 p.m., he had not observed any conflict between Appellant and Erica. He testified that "whatever happened occurred after he left."

Appellant's testimony differed markedly from Erica's. He testified that, on the morning of November 11, he and Erica engaged in consensual vaginal and anal sex. He testified Erica became upset when she discovered his ex-wife's phone number in his room. Afterwards, they argued in the kitchen, where he pushed her and she hit her head on a pantry shelf. He testified that, after getting Erica a towel, he went to his room, shut his door, and started punching the wall. She confronted him. He told her to leave him alone and cursed her. He saw blood coming from her head but thought it was "just a little split and blood was coming from it."

Appellant further testified that, when Erica's family was calling, he urged her to answer her cell phone but she didn't want to "[b]ecause they're going to know something." He testified he wanted Erica to leave and get her head checked but she didn't want to leave. He also testified he lied to Officer Findley about Erica's injury because Erica had asked him what to tell hospital personnel and he told her "[t]ell them the truth or tell them you fell." He thought she told them she had fallen because, at the time she left for treatment, she was acting though she didn't want to involve the authorities. He also testified that he did not have the box cutter in his hand to taunt Erica. He also testified he did not want to be with Erica because he was cheating on her with another woman.

8

Thereafter, the jury found Appellant guilty of the offense of aggravated sexual assault as charged in the indictment. On September 30, 2008, Appellant filed a motion for a new trial asserting the verdict was contrary to the evidence. The trial court denied Appellant's motion and this appeal followed.

## Discussion

Appellant asserts the evidence is legally and factually insufficient to support his conviction because: (1) the evidence established that the sexual contact "occurred outside" any assaultive conduct, (2) the State failed to prove Appellant used or exhibited his hands as a deadly weapon, and (3) Erica's injuries did not amount to serious bodily harm. He also contends the trial court erred by admitting evidence of his assaultive behavior occurring prior to, and after, he allegedly penetrated the victim's anus with his finger because the evidence was irrelevant and prejudicial.

## I.      Sufficiency of the Evidence

When both the legal and factual sufficiency of the evidence are challenged, we must first determine whether the evidence is legally sufficient to support the verdict. *Clewis v. State*, 922 S.W.2d 126, 133 (Tex.Crim.App. 1996). *See Triplett v. State*, No. 07-08-0121-CR, 2009 WL 1940895, at *4 (Tex.App.–Amarillo 2009, no pet. h.).

**A.      Legal Sufficiency**

**1.      Standard of Review**

It is a fundamental rule of criminal law that one cannot be convicted of a crime unless it is shown beyond a reasonable doubt that the defendant committed each element of the alleged offense.  U.S. Const. amend. XIV; Tex. Code Crim. Proc. Ann. art. 38.03 (Vernon Supp. 2008); Tex. Penal Code Ann. § 2.01.  Evidence is legally insufficient if, when viewed in a light most favorable to the prosecution, a rational trier of fact could not have found each element of the offense beyond a reasonable doubt.  *Jackson v. Virginia*, 443 U.S. 307, 318, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560, 573 (1979); *Laster v. State*, 275 S.W.3d 512, 517 (Tex.Crim.App. 2009).

The standard is the same in both direct and circumstantial evidence cases.  *Laster,* 275 S.W.3d at 517-18.  In measuring the legal sufficiency of the evidence to sustain a conviction, we measure the elements of the offense as defined by a hypothetically correct jury charge.  *Malik v. State*, 953 S.W.2d 234, 240 (Tex.Crim.App. 1997).  A hypothetically correct jury charge that accurately promulgates the law, is authorized by the indictment, does not necessarily increase the State's burden of proof or restrict the State's theory of criminal responsibility, and adequately describes the particular offense. *Grotti v. State*, 273 S.W.3d 273, 280-81 (Tex.Crim.App. 2008).

In measuring legal sufficiency, an appellate court must consider all the evidence that was before the jury–whether proper or improper–so that we can make an assessment from the jury's perspective. *Miles v. State*, 918 S.W.2d 511, 512 (Tex.Crim.App. 1996). As an appellate court, we sit as a final due process safeguard, ensuring only the rationality of the fact finder, and we must uphold the jury's verdict unless it is found to be irrational or unsupported by more than a "mere modicum" of evidence. *Moreno v. State*, 755 S.W.2d 866, 867 (Tex.Crim.App. 1988). Our role is restricted to guarding against the rare occurrence when a fact finder does not act rationally. *Laster*, 275 S.W.3d at 517.

### 2. Analysis – Aggravated Sexual Assault

Per the indictment, as elected by the State and charged by the court, Appellant committed the offense of aggravated sexual assault if he (1) intentionally or knowingly (2) caused the penetration of the victim's anus (3) with his finger (4) without the victim's consent; § 22.021(a)(1)(A)(i), and (5) caused serious bodily injury and used or exhibited a deadly weapon, to-wit: his hands, in the course of the same criminal episode. § 22.021(a)(2)(A)(i), (iv).

Appellant contends the State's evidence of aggravated sexual assault was insufficient because there was no physical evidence establishing where and when any sexual contact occurred. He also asserts the State's evidence that he used or exhibited his hands as a deadly weapon was insufficient because: (1) the victim's head injury occurred prior to any sexual assault; (2) there were no photographs showing his knuckles

11

were swollen on November 11; (3) Detective Taylor's opinion that Appellant's use of his hands met the statutory definition of a deadly weapon was based solely on information received from the victim;  (4) the evidence showed the victim's head hit a pantry shelf; (5) there was no medical evidence the victim's head injury was caused by Appellant striking her; and (6) evidence of Appellant's use of his hands to push or strike the victim did not rise to that of a deadly weapon.

Here, the victim's testimony alone regarding when and where the sexual assault occurred was sufficient.[6]   In aggravated sexual assault cases, the uncorroborated testimony of a victim alone is sufficient to support a conviction if the victim informed a person, other than the defendant, of the alleged offense within a year after the date the offense allegedly occurred.  Tex. Code Crim. Proc. Ann. art. 38.07(a) (Vernon 2005).  *See Benton v. State*, 237 S.W.3d 400, 404 (Tex.App.–Waco 2007, pet. ref'd) *(citing Garcia v. State*, 563 S.W.2d 925, 928 (Tex.Crim.App. 1978)); *Abbot v. State,* 196 S.W.3d 334, 341 (Tex.App.–Waco 2006, pet. ref'd).  Here, immediately after leaving Appellant's apartment, Erica went to the hospital and reported the alleged offense.  In addition, the State has no burden to produce corroborating or physical evidence.  *Benton*, 237 S.W.3d at 404.

Further, that the victim's injuries occurred immediately prior to Appellant's sexual assault of the victim is of no moment.  The courts of this State have on several occasions

---

[6]Neel, the SANE nurse who examined Erica, testified the injuries to her anus were consistent with the time frame within which the sexual assault allegedly occurred.

construed the phrase "criminal episode" to include the period immediately before or after the actual act of sexual assault. *Jackson v. State*, 591 S.W.2d 820, 822 (Tex.Crim.App. 1979); *Taylor v. State*, 693 S.W.2d 4, 6 (Tex.App.–Beaumont 1985, pet. ref'd); *Griffith v. State*, 635 S.W.2d 145, 146 (Tex.App.–Houston [1st Dist.] 1982, no pet.).

To the extent Appellant asserts that his assaultive conduct, before and after the sexual assault at the kitchen sink, could not be considered as part of a "criminal episode" under the aggravated sexual assault statute, a "criminal episode" does not begin and end with the sexual assault. Rather, the "criminal episode" "begins when the attacker in any way restricts the victim's freedom of movement and it ends with the final release or escape of the victim from the attacker's control." *Cruz v. State*, 238 S.W.3d 389, 398 (Tex.App.–Houston [1st Dist.] 2006, no pet.). (citing *Burns v. State*, 728 S.W.2d 114, 116 (Tex.App.–Houston [14th Dist.] 1987, pet. ref'd). *See Figueroa v. State*, No. 07-05-0314-CR, 2006 WL 825036, at *2 (Tex.App.–Amarillo 2006, no pet.) (not designated for publication). At the very least, when Appellant placed his hands around the victim's neck in the kitchen, her freedom of movement was first restricted and she did not escape until she was able to leave the apartment hours later to receive medical treatment. *See Burns*, 728 S.W.2d at 116 (victim's movement first restricted when accused displayed a knife and held complainant's arms); *Griffith,* 635 S.W.2d at 146 (victim's movement first restricted when accused placed his hands around her neck and threatened her).[7] Accordingly, the

---

[7]*Figueroa,* 2006 WL 825036, at *2 (victim's movement first restricted when appellant began beating, choking and biting her in the living room and victim was subsequently sexually assaulted in bedroom); *Arnold v. State*, No. 05-96-00764-CR, 1998 WL 315621, at *3 (Tex.App.–Dallas 1998, no pet.) (not designated for

evidence established that the sexual assault occurred within the context of the physical assault.

Furthermore, Appellant cites no legal authority for his propositions that an officer's description of the accused's physical appearance must be vitiated if the officer did not photograph the accused or that an officer's opinion may not be based solely on information received from the victim. Neither does Appellant make any citation to the record in support of his assertion that Appellant's use of his hands, although assaultive, did not rise to that of a deadly weapon. Nor does he cite any legal authority in support of the proposition that a victim's testimony regarding the manner in which she received her injuries must be corroborated by medical evidence.

These portions of Appellant's first issue, offered in support of his assertion of legal insufficiency, are inadequately briefed. *See* Tex. R. App. P. 38.1(e), (f), (h). "This Court has no obligation to construct and compose Appellant's issues, facts, and arguments with appropriate citations to authorities and to the record. *See Busby v. State*, 253 S.W.3d 661, 673 (Tex.Crim.App. 2008); *Cardenas v. State*, 30 S.W.3d 384, 393 (Tex.Crim.App. 2000); *Jones v. State*, 225 S.W.3d 772, 778 (Tex.App.–Houston [14th Dist.] 2007, no pet.).

---

publication) (victim's movement first restricted when appellant held a gun to her back and told her to come with him); *Kehoe v. State*, No. 05-90-01155-CR, 1992 WL 141156, at *4 (Tex.App.–Dallas 1992, no pet.) (not designated for publication) (victim's movement first restricted when accused refused to allow victim to leave his apartment).

Having reviewed all of the evidence in a light most favorable to the prosecution, we find that the totality of the evidence presented at Appellant's trial was sufficient to persuade a rational trier of fact beyond a reasonable doubt that Appellant committed the offense alleged in the indictment.

**B.      Factual Sufficiency**

**1.      Standard of Review**

When conducting a factual sufficiency review, we examine all the evidence in a neutral light and determine whether the trier of fact was rationally justified in finding guilt beyond a reasonable doubt. *Roberts v. State*, 220 S.W.3d 521, 524 (Tex.Crim.App. 2007), *cert. denied*, ___ U.S. ___, 128 S.Ct. 282, 169 L.Ed.2d 206 (2007); *Watson v. State*, 204 S.W.3d 404, 415 (Tex.Crim.App. 2006).   We give deference to the fact finder's determination when supported by the record, and cannot reverse a conviction unless we find some objective basis in the record demonstrating that the great weight and preponderance of the evidence contradicts the verdict.  *Watson*, 204 S.W.3d at 417.  The criminal verdict will be set aside "only if the evidence is so weak that the verdict is clearly wrong and manifestly unjust, or the contrary evidence so strong that the standard of proof beyond a reasonable doubt could not have been met."  *Gaza v. State*, 213 S.W.3d 338, 343 (Tex.Crim.App. 2007).  In addition, the fact finder is entitled to judge the credibility of the witnesses and may choose to believe all, or some or none of the testimony presented. *Chambers v. State*, 805 S.W.2d 459, 461 (Tex.Crim.App. 1991).

**2. Analysis – Aggravated Sexual Assault**

Appellant contends the State's evidence of aggravated sexual assault is factually insufficient because Appellant testified he was angry and upset when he pushed Erica. Appellant also contends the State's evidence in support of the jury's finding that Appellant used his hands as a deadly weapon is factually insufficient because: (1) Officer Findley did not find any blood in the kitchen where the victim testified an assault occurred; (2) Officer Findley's uncorroborated testimony that, at the time of his arrest, the knuckles of Appellant's right hand were swollen, is insufficient to support the jury's finding of use of a deadly weapon; (3) there was testimony that the victim's head injury was caused, not by him striking her, but by a pantry shelf, and (4) there was no medical evidence supporting the victim's testimony that her head injury was caused by Appellant striking her.

**A. Sexual Assault**

Appellant contends that his admitted assault, pushing Erica into the pantry where she cut her head on a shelf, could not be considered a part of any sexual assault that occurred afterwards because he was angry and upset that she was ending their relationship, *i.e.,* he did not push her intending to have sex with her.

The victim's testimony indicates that, moments after Appellant struck her, he began to force himself on her by engaging in anal sex while she was attempting to treat her head wound at the kitchen sink. Given the victim's testimony that she had refused numerous

16

requests by Appellant to engage in anal sex in the past, her statements to Appellant that she was leaving him, the timing and substance of Appellant's initial sexual assault, there was sufficient evidence upon which a rational trier of fact could believe Appellant struck the victim with the intent to immobilize, or frighten, her and make her more compliant with his desire to force her to submit to anal sex.

Further, although much of Appellant's account of what occurred at the apartment on November 11 differed markedly from the victim's testimony, the jury is the "exclusive judge of the credibility of witnesses," and the reconciliation of conflicts in the testimony is within the "exclusive province of the jury." Tex. Code Crim. Proc. Ann. arts. 36.13 & 38.04 (Vernon 1979 & 2007); *Jones v. State*, 944 S.W.2d 642, 647 (Tex.Crim.App. 1996), *cert. denied*, 522 U.S. 832, 118 S.Ct. 100, 139 L.Ed.2d 54 (1997). By their guilty verdict, the jury apparently chose to believe the victim's version of the events, and not Appellant's. See *Chambers*, 805 S.W.2d at 461.

### B. Deadly Weapon

Appellant's indictment alleged his hands constituted a deadly weapon.[8] Body parts, such as hands and knees, may be deadly weapons based on their manner of use or intended use and their capacity to produce death or serious bodily injury. *Turner v. State*,

---

[8]A deadly weapon is anything that, in the manner of its use or intended use, is capable of causing death or serious bodily injury. § 1.07(17)(B). The word "capable" enables the statute to cover conduct that threatens deadly force, even if the actor has no intention of actually using deadly force. *Tisdale v. State*, 686 S.W.2d 110, 114-15 (Tex.Crim.App. 1984) (op. on reh'g).

664 S.W.2d 86, 90 (Tex.Crim.App. 1983); *Vela v. State*, 159 S.W.3d 172, 182 (Tex.App.–Corpus Christi 2004, no pet.). "A hand or a foot may be a deadly weapon within the statutory meaning 'depending upon the evidence shown.'" *Lane v. State*, 151 S.W.3d 188, 191 (Tex.Crim.App. 2004) (quoting *Turner*, 664 S.W.2d at 90).[9]

In determining whether an object is a deadly weapon, the jury may consider all the surrounding facts, including the defendant's words and whether the victim feared death or serious bodily injury. *Blain v. State*, 647 S.W.2d 293, 294 (Tex.Crim.App. 1983). *See Hernandez v. State*, 649 S.W.2d 720, 722 (Tex.App.–Amarillo 1983, no pet.). Although wounds are not a necessary prerequisite for an object to be considered a deadly weapon; *Turner*, 664 S.W.2d at 90, injuries, if any, inflicted on the victim are factors to be considered in determining whether a hand or foot was used as a deadly weapon. *Lane,* 151 S.W.3d at 191. Moreover, the State need not prove that the complainant actually sustained serious bodily injury for the alleged weapon to be a deadly weapon; *Jefferson v. State*, 974 S.W.2d 887, 892 (Tex.App.–Austin 1998, no pet.), nor that the accused intended to cause serious bodily injury. *Lane v. State*, 111 S.W.3d 203, 210 (Tex.App.–Eastland 2003), *aff'd*, 151 S.W.3d 188 (Tex.Crim.App. 2004) (quoting *Clark v. State*, 886 S.W.2d 844, 845 (Tex.App.–Eastland 1994, no pet.). Rather, the State need only prove that the hands were capable of causing serious bodily injury in the way they

---

[9]Indeed, almost anything can be a deadly weapon depending upon the evidence shown. *See Coleman v. State*, 145 S.W.3d 649-660 (Tex.Crim.App. 2004) (Cochran, J., concurring).

were used or intended to be used. *Hill v. State*, 913 S.W.2d 581, 584 (Tex.Crim.App. 1996); *Jefferson*, 974 S.W.2d at 892; *Vela*, 159 S.W.3d at 182.

Here, the evidence showed there was a size difference between the victim and Appellant–he was taller and bigger. He grabbed the victim's throat with his hand and caused bruising consistent with choking near her collarbone. He struck the victim on the head with his closed fist with force sufficient to create a significant gaping wound that split the victim's scalp, caused profuse bleeding, and required fourteen staples to close. That a shelf in the pantry may have actually caused the wound is of no consequence where the Appellant's striking of the victim caused her to fall into the pantry. After knocking the victim into the pantry, he punched the victim again with his closed fist in the side of her head and then her back. The victim's body was bruised near her collarbone, on her right arm, below her left knee, on her ankle, and there were scratches on her hips.

Officer Findley testified that, at the emergency room, she could see in the victim's head through the wound and the victim complained of pain in her head. Neel, the SANE nurse who examined the victim, testified that the head wound had the potential for death and could lead to serious permanent disfigurement. Both Officer Findley and Neel testified the victim's injuries were consistent with the victim's account of what occurred that day. Officer Findley also testified the knuckles of Appellant's right hand were swollen when she placed him under arrest. Detective Taylor opined that the victim's head injury qualified as

19

a serious bodily injury and that, based upon his investigation, Appellant used his hands as a deadly weapon.[10]

Further, there was testimony in the record disputing evidence relied upon by Appellant to establish factual insufficiency, *i.e.,* testimony the victim struck her head on a panty shelf or case of bottled water and Officer Findley's testimony that, more than five hours after the assault in the kitchen, she did not see any blood in the kitchen. This testimony and the inferences that could be derived therefrom are contrary to the victim's testimony and the corroborating testimony of others who testified that the victim's account was consistent with the events she alleged occurred and her injuries. Indeed, while there was testimony that the victim's three statements, given under duress and spanning a two day period following the attack, were consistent, Appellant's responses to Officer Findley's questions the day of the attack and his trial testimony were inconsistent. Based upon Appellant's inconsistencies, a rational jury could have decided to believe Erica and disbelieve Appellant.

The jury is the "exclusive judge of the credibility of witnesses," and the reconciliation of conflicts in the testimony is also within the "exclusive province of the jury." Tex. Code Crim. Proc. Ann. arts. 36.13 & 38.04 (Vernon 1979 & 2007); *Jones v. State*, 944 S.W.2d 642, 647 (Tex.Crim.App. 1996), *cert. denied*, 522 U.S. 832, 118 S.Ct. 100, 139 L.Ed.2d

---

[10]Either expert or lay testimony may be sufficient to support a deadly weapon finding by the jury. *See English v. State*, 647 S.W.2d 667, 668-69 (Tex.Crim.App. 1983).

54 (1997). By rendering a guilty verdict, the jury apparently chose to accept the truthfulness of the victim's version of the events on November 11 rather than Appellant's version. *Washington v. State*, 127 S.W.3d 197, 204 (Tex.App.–Houston [1ˢᵗ Dist.] 2003, pet. dism'd).

Our evaluation of the evidence "should not substantially intrude upon the jury's role as the sole judge of the weight and credibility of testimony." *Jones*, 944 S.W.2d at 648. After due consideration and taking into account all of the specific acts and injuries, we cannot say that the evidence in support of the jury's verdict was so weak as to render the verdict clearly wrong or manifestly unjust. See *Petruccelli v. State,* 174 S.W.3d 761, 770 (Tex.App.–Waco 2005, pet. ref'd), *cert. denied*, 549 U.S. 839, 127 S.Ct. 106, 166 L.Ed.2d 66 (2006).[11] Appellant's first issue is overruled.

## II.    Extraneous Offense Evidence

Appellant next asserts the trial court erred by admitting extraneous offense evidence of his assaultive behavior occurring prior to, and after, he penetrated the victim's anus with

---

[11]*Moore v. State,* 739 S.W.2d 347 (Tex.Crim.App. 1987) is of no assistance to Appellant. Aside from being a case determining whether an injury was a "serious bodily injury" rather than whether the defendant used a "deadly weapon," the facts are inapposite. In *Moore*, the complainant did not notice he had been wounded in the back until he saw blood on his mother's couch after laying down. 739 S.W.2d at 349. The treating physician also testified that the wound was not the type of bodily injury that would create either a substantial risk of death or significant scarring. *Id.* at 350. Here, the victim was choked and then struck in the head with enough force to split her scalp open and land her in a pantry. Afterwards, she was punched again in the head and in the back. Bruising on her body indicated she had been choked and further beaten. Her head wound bled profusely and required fourteen staples to close. In addition, the SANE nurse opined that the head wound had the potential for death and could lead to serious permanent disfigurement.

his finger. He also asserts the evidence was inadmissible because the evidence was irrelevant and prejudicial.

We review a trial court's decision to admit or exclude evidence for abuse of discretion; *Page v.* State, 213 S.W.3d 332, 337 (Tex.Crim.App. 2006), and "[a]ppellate courts will uphold a trial court's ruling on admissibility of evidence as long as the trial court's ruling was at least within the zone of reasonable disagreement." *Id*. *See Hernandez v. State*, 205 S.W.3d 555, 558 (Tex.App.--Amarillo 2006, pet. ref'd).

As a general rule, to prevent an accused from being prosecuted for some collateral crime or misconduct, the State may not introduce evidence of bad acts similar to the offense charged. *Roberts v. State*, 29 S.W.3d 596, 600-01 (Tex.App.–Houston [1st Dist.] 2000, pet. ref'd). Rule 404(b) provides that evidence of "other crimes, wrongs or acts" is not admissible to prove a defendant's character in order to show action in conformity therewith. Tex. R. Evid. 404(b).

An exception to the general rule is same transaction contextual evidence.[12] *See Rodgers v. State*, 853 S.W.2d 29, 32-33 (Tex.Crim.App. 1993). Same transaction contextual extraneous evidence is admitted not because it has any particular evidentiary

---

[12]Where several crimes are intermixed, blended, or connected with one another so that they form an indivisible criminal transaction, they are collectively referred to as same transaction contextual evidence. *See Wyatt v. State*, 23 S.W.3d 18, 25 (Tex.Crim.App. 2000); *Mayes v. State*, 816 S.W.2d 79, 86-87 (Tex.Crim.App. 1991). There are two types of contextual evidence: (1) evidence of other offenses connected with the primary offense, referred to as same transaction contextual evidence; and (2) general background evidence, referred to as background contextual evidence. *Id.*

purpose, but rather because, in narrating one offense, it is impracticable to avoid describing the other extraneous offense. *Id.* Thus, same transaction contextual offense evidence illuminates the nature of the crime alleged by imparting to the trier of fact information essential to understanding the context and circumstances of events. *Camacho v. State*, 864 S.W.2d 524, 532 (Tex.Crim.App. 1993).

Another exception to the general rule of exclusion is that evidence of "other crimes, wrongs or acts" may be admissible if (1) it has relevance to a material issue other than to show that the accused acted in conformity with some trait of character, and (2) the probative value of the evidence is not "substantially outweighed by the danger of unfair prejudice." *Roberts*, 29 S.W.3d at 601.

Here, we conclude the extraneous offense evidence was admissible to show the context in which the criminal act occurred because Appellant's assaultive behavior was "blended, or connected" to the sexual assault forming an "indivisible criminal transaction." Moreover, the evidence was helpful to the jury in their determination whether Appellant used or exhibited a deadly weapon during the "same criminal episode."

We hold the trial court did not abuse its discretion by admitting this evidence. The evidence of Appellant's assaultive behavior constituted contextual evidence connected to the charged offense and therefore, it was relevant under Rules 401 and 404(b). Tex. R. Evid. 401, 404(b). We must also consider whether the unfair prejudicial effect of the extraneous evidence substantially outweighed its probative value. In doing so, we give

23

great deference to the trial court's determination of admissibility. *Montgomery v. State*, 810 S.W.2d 372, 391-92 (Tex.Crim.App. 1990) (op. on reh'g). Moreover, the prejudicial nature of same transaction contextual evidence rarely renders such evidence inadmissible, as long as it sets the stage for the jury's comprehension of the whole criminal transaction. *Houston v. State*, 832 S.W.2d 180, 183 (Tex.App.–Waco 1992, pet. dism'd) (citing *Wilkerson v. State*, 736 S.W.2d 656, 660-61 (Tex.Crim.App. 1987). "It has long been the rule in this State that the jury is entitled to know all relevant surrounding facts and circumstances of the charged offense; an offense is not tried in a vacuum." *Moreno v. State*, 721 S.W.2d 295, 301 (Tex.Crim.App. 1986).

Here, the prejudicial effect of admitting the extraneous offense evidence was slight in comparison to its probative value. The evidence of Appellant's assaultive behavior was part and parcel of the "same criminal episode;" and necessary for the jury to consider in its determination whether Appellant committed an aggravated sexual assault, or, the lesser-included offense of sexual assault.[13] Thus, we agree with the trial court's determination that the facts of this same criminal episode, including Appellant's assaultive behavior, were not so egregious as to be highly prejudicial. Consequently, the trial court did not abuse its discretion in admitting this evidence. Appellant's second issue is overruled.

---

[13]The jury was instructed on both offenses.

## Conclusion

The trial court's judgment is affirmed.

Patrick A. Pirtle
Justice

Publish.