In The


Court of Appeals


Sixth Appellate District of Texas at Texarkana



______________________________



No. 06-09-00103-CR


______________________________




ROBERT RAY HESTER A/K/A BOBBY HESTER, Appellant



V.



THE STATE OF TEXAS, Appellee




 


On Appeal from the 102nd Judicial District Court


Bowie County, Texas


Trial Court No. 08F0311-102




 




Before Morriss, C.J., Carter and Moseley, JJ.


Memorandum Opinion by Justice Moseley



MEMORANDUM OPINION



 After having been convicted by a jury of three counts of the first-degree felony of aggravated
assault on a public servant (1) and having been assessed a penalty of twenty-five years' imprisonment
and a $7,000.00 fine on each count, Robert Ray Hester appeals. We affirm his convictions. (2) 

Factual Background

 The chain of events occurring on February 18, 2008, indicates that Hester experiences some
difficulty with anger management. Hester and his wife, Nicole Stover, (3) were experiencing marital
difficulties. Nicole had recently filed suit for divorce and on that day, Hester went to Nicole's
workplace, where they quarreled. He then followed her home. Nicole described Hester's behavior
at her home as "verbally abusive" and he had made "lewd gestures." Nicole told Hester she was
taking her two children and leaving the house, but Hester told her she would not be leaving, and took
a pizza planned for dinner and "shoved it all over" Nicole's ten-year-old son. Hester struck Nicole
in the back and grabbed her crotch, squeezing and twisting it. (4) He then told her that he was going
to kill her and the children. Testimony describing these last three acts by Hester drew objections at
trial from Hester, the overruling of which form the bases of Hester's first two points of error. At one
point during this confrontation, Nicole's son went into the kitchen and returned with a knife in his
hand. After the child complied with Nicole's direction to put up the knife, Hester chased the boy
around the house. During the chase, Hester's cell phone rang, and when he answered it, Nicole took
the opportunity of the distraction and fled with the children from the house. 

 Nicole took the children to the house of her former husband, John Stover, who was also the
father of Nicole's children. Two security camera video recordings from Stover's property were
admitted into evidence and played for the jury. Hester was the star of these video recordings. In one,
Hester can be observed on the edge of the picture screen, apparently urinating in a large flower pot
or on the porch. It goes on to portray Hester attacking Stover and throwing him to the ground,
attempting to beat or kick in the front door, and then finally driving his white sport utility vehicle
(SUV) through the front doors of the house. In the other video recording, Hester's SUV is seen
driving up the driveway; the SUV proceeds partially out of the frame of the picture and when it
returns, the front end has been damaged and one headlight is no longer functional. 

 Wendy Farley, engaged to Stover at the time and present on the night of February 18, testified
that the video recording depicted the part of the incident wherein Hester drove his SUV into the cars
in Stover's garage. Photographs were admitted showing a damaged garage door and vehicles in the
garage which had been damaged. At some point Hester also rammed the BMW automobile owned
by Nicole's employer, which had been the vehicle Nicole drove from her house to Stover's house. 

 During this portion of the one-man riot, the occupants of Stover's house had reported the
incident to law enforcement officers and at about this point during the incident, officers had begun
to arrive. Bowie County Sheriff's Department officers arrived, as well as officers from the
Texarkana, Texas, Police Department. Nathan Head, a Bowie County deputy, arrived at the scene;
his in-vehicle camera recorded some of the activities. The very beginning of the video recording
shows a large white SUV directly in front of Head's vehicle; as the recording progresses, the SUV
pulls forward to face Head's patrol car and then pulls away. From Head's narration of the video
recording at trial and pictures of Hester's SUV introduced into evidence, taken the next day in
daylight, it appears that the large white SUV facing Head's video camera is Hester's SUV. In the
video recording, the emergency lights on Head's vehicle can be seen clearly flashing while the SUV
turns and drives away from Head. From a distance, Head's camera recorded Hester slamming into
the garage and at least one vehicle. Later during the recording, Head's vehicle is parked near the
front of Stover's house. Hester's white SUV can be seen driving past and officers moving quickly
away. At that point in the recording, at least two law enforcement officers (from testimony at trial,
the officers appear to be Head and Lieutenant Joe Vasquez, a Bowie County Sheriff's deputy) can
be discerned near the Stover house. Within approximately a minute later, the recording shows
Hester's SUV going past the camera's view a second time and at least one law enforcement vehicle
can be seen approaching with emergency lights blinking distinctly. 

 Vasquez had arrived in his private vehicle, a vehicle which was not equipped with emergency
lights. Vasquez testified that as he exited his vehicle, he heard Hester's SUV engine revving; he then
saw the vehicle approach him at a high rate of speed, without lights. Vasquez shined both his
flashlight and a light mounted on his pistol at the vehicle and shouted that he was with the sheriff's
department and commanded the vehicle to stop. Vasquez had to jump out of the way to avoid being
hit, and fired three shots toward the SUV's tires. Vasquez said at that time, he feared for his life, that
of his partner, Head, and for the safety of the people in the house. Vasquez did say that at that point,
he could not see emergency lights in the immediate area. A short time later, after Hester's SUV had
crashed through a gate, Vasquez and other officers followed the SUV into an adjacent pasture. 
Hester once again drove toward the officers and Vasquez again fired at the SUV. At that point,
Vasquez said there were law enforcement vehicles with emergency lights flashing within fifteen to
twenty-five yards of Hester's vehicle. 

 Cody Tipps, a patrolman with the Texarkana, Texas, Police Department, had been chasing
Hester's vehicle across the property and eventually rode into the pasture on the hood of a police car. 
The vehicle on which he rode had its emergency lights activated; Tipps said he saw several law
enforcement vehicles on the road next to the pasture where Hester was located and that all those
vehicles had emergency lights flashing. Hester's Suburban "made a pass at the patrol unit" upon
which Tipps was sitting. Officers shouted they were police and commanded the driver of the vehicle
to stop, but Hester drove off a ways into the pasture. When Tipps and the other officers approached
Hester's vehicle on foot, Hester turned the vehicle toward Tipps, Vasquez, and another Texarkana
police officer, Brad Thacker. Tipps confirmed that Vasquez illuminated Hester's SUV with a
flashlight and the light mounted on his pistol, and the officers again identified themselves, calling
out for the driver of the vehicle to stop. Tipps and Thacker fired at the vehicle. Officer Michael
Jones testified that he and Thacker drove their marked police cars into the pasture with the headlight
emergency lights on; Hester drove his vehicle within seven to ten yards of the automobile driven by
Jones. Tipps said he had "no doubt" at that point that the Suburban was going to run the officers
over and Tipps feared for the officers' safety. Eventually, Hester's vehicle came to a stop, and he was
placed under arrest. 

Hester's Appeal

 Hester pled guilty to two felony counts of criminal mischief (those concerning the damage
caused by him to Stover's house, vehicles, and Nicole's vehicle). (5) He pled not guilty to the three
counts of aggravated assault on public servants and the jury found him guilty, assessing the sentences
to which he was eventually sentenced. Those convictions are the subject of the instant appeal. 

No Error in Admission of Extraneous-Offense Evidence

 Hester's first point of error complains that Nicole's testimony about the assaultive acts Hester
took toward Nicole before the incidents in the pasture with law enforcement officers should have
been excluded by the trial court. Hester initially claims evidence about his a) hitting Nicole in the
back; b) grabbing, squeezing, and twisting her crotch area; and c) telling her he was going to kill her
and her children was not "relevant to any contested issue"; however, his trial counsel did not make
an objection to relevance. (6) Rather, when Nicole testified to the three instances cited above, on each
occasion, Hester's trial counsel stated he objected "under 404b [sic] and 403." Each time, the trial
court overruled the objection. Nonetheless, Hester's appellate argument is couched in terms of a
complaint that admission of the testimony violated Rule 404(b), to-wit:

 Evidence of other crimes, wrongs or acts is not admissible to prove the character of
a person in order to show action in conformity therewith. It may, however, be
admissible for other purposes, such as proof of motive, opportunity, intent,
preparation, plan, knowledge, identity, or absence of mistake or accident, provided
that upon timely request by the accused in a criminal case, reasonable notice is given
in advance of trial of intent to introduce in the State's case-in-chief such evidence
other than that arising in the same transaction.


Tex. R. Evid. 404. Hester's defense at trial centered on his contention that he was unaware that the
persons in the pasture were law enforcement officers attempting to stop or confront him; accordingly,
he maintains, he did not possess the intent to assault public servants. Thus, reasons Hester, evidence
of any extraneous acts committed by him toward Nicole were not relevant to the offenses for which
he was being tried. 

 The possible bases for admission of extraneous acts listed in Rule 404(b) are not exclusive
or exhaustive. Montgomery v. State, 810 S.W.2d 372, 388 (Tex. Crim. App. 1990) (op. on reh'g). 
We employ an abuse of discretion standard when reviewing a trial court's decision to admit evidence. 
Santellan v. State, 939 S.W.2d 155, 168-69 (Tex. Crim. App. 1997). So long as the trial court's
ruling was within the "zone of reasonable disagreement," we will not find an abuse of discretion and
the trial court's ruling will be upheld. Id. at 169. In addition to the reasons for admissibility
suggested in Rule 404(b), the Texas Court of Criminal Appeals has held that background evidence
may be an "other purpose" for the admission of evidence and, if so, it is admissible under Rule
404(b). Mayes v. State, 816 S.W.2d 79, 86 (Tex. Crim. App. 1991). The Texas Court of Criminal
Appeals has grouped background evidence into two categories: (1) same transaction contextual
evidence and (2) background contextual evidence. Id. at 86-87; Rogers v. State, 853 S.W.2d 29, 32,
33 (Tex. Crim. App. 1993). Background evidence is admissible under Rule 404(b), where relevant
under Tex. R. Evid. 401. Rogers, 853 S.W.2d at 32. If relevant, then the issue is whether the
background evidence should be admitted as an "other purpose" under Rule 404(b). Id. 

 Same transaction contextual evidence is admissible where "several crimes are intermixed,
or blended with one another, or connected so that they form an indivisible criminal transaction, and
full proof by testimony, whether direct or circumstantial, of any one of them cannot be given without
showing the others." Mayes, 816 S.W.2d at 86-87 n.4. Same transaction contextual evidence should
only be admitted to the extent that it is necessary to the jury's understanding of the offense or when
the facts and circumstances of the offense would make little or no sense without also bringing in this
evidence. England v. State, 887 S.W.2d 902, 915 (Tex. Crim. App. 1994); Rogers, 853 S.W.2d at
33. Background evidence is admissible under Rule 404(b), where relevant under Rule 401 of the
Texas Rules of Evidence. (7) Rogers, 853 S.W.2d at 32. If relevant, then the issue is whether the
background evidence should be admitted as an "other purpose" under Rule 404(b). Id. Background
contextual evidence "fill[s] in the background of the narrative and give[s] it interest, color, and
lifelikeness." Mayes, 816 S.W.2d at 87. In other words, the series of events which took place that
night constituted an uninterrupted continuum of conduct which was, in essence, a single event. This
type of evidence is admitted because of the "salutary effects it has on the jury's comprehension of
the offense in question" and not out of necessity but out of judicial grace. Id. However, "propensity"
evidence, i.e., character evidence that tends to prove that an accused acted in conformity therewith,
offered as background contextual evidence, is not admissible because the rationale behind admitting
such evidence--that it is "helpful to a jury"--is not an "other purpose" under Rule 404(b). Id. at 88.

 Hester also complains the trial court did not enunciate its reasons for overruling Hester's
objections to Nicole's testimony. Despite this complaint, Hester acknowledges this Court's language
in Grider v. State, wherein we pointed out that although a trial court's explanation of its reasoning
employed when determining that an extraneous offense is relevant apart from character conformity
or a finding that the probative value is not substantially outweighed by potential for prejudice, it
"would be helpful in reviewing such decisions, [but] it is not required." Grider v. State, 69 S.W.3d
681, 688 (Tex. App.--Texarkana 2002, no pet.) (citing Montgomery, 810 S.W.2d at 397). Hester
indicates, however, that we should distinguish Grider because in that case, the trial court specifically
said the evidence in question was relevant "for the limited purposes of establishing motive, intent,
and system, and to rebut Grider's defensive theory," id., whereas, in the instant case, the trial court
offered no explanation at all for admitting Nicole's testimony. One should take into account that a
trial court's evidentiary ruling must be upheld on appeal if it is "reasonably supported by the record
and is correct under any applicable theory of law . . . [and] even when the trial court gives the wrong
reason for its decision." Carter v. State, 145 S.W.3d 702, 707 (Tex. App.--Dallas 2004, pet. ref'd)
(citing Romero v. State, 800 S.W.2d 539, 543 (Tex. Crim. App. 1990)). It would be counterintuitive
to sustain such a ruling when a court announces an incorrect reasoning for its rulings but finds error
when no reason is expressed. Therefore, the same rule for review holds true where the trial court
gives no reason for its ruling. Hughes v. State, 24 S.W.3d 833, 840 n.4 (Tex. Crim. App. 2000) (trial
court gave no reason for overruling motion to suppress); State v. Shastid, 940 S.W.2d 405, 406-08
(Tex. App.--Fort Worth 1997, no pet.) (trial court gave no reason for granting defendant's pretrial
habeas writ); McDonald v. State, 911 S.W.2d 798, 801 (Tex. App.--San Antonio 1995, pet. dism'd)
(trial court gave no reason for excluding defendant's expert witness testimony). We find no error in
the trial court's lack of explicit reason for overruling Hester's objections. 

 In Hoitt v. State, 28 S.W.3d 162, 169 (Tex. App.--Texarkana 2000), pet. dism'd,
improvidently granted, 65 S.W.3d 59 (Tex. Crim. App. 2001), the appellant was charged and
convicted of assault on a public servant. Hoitt first assaulted one person and demanded keys to his
vehicle; after this unsuccessful attempt, Hoitt then went to a neighboring house and made similar
demand for car keys to the neighbor's automobile. Authorities arrived; after a struggle and two
chases, Hoitt hit and kicked one of the officers. This Court found that evidence of the assault against
the first person and Hoitt's attempt to steal his vehicle was admissible to show the defendant's
"motive, intent, and plan to steal a vehicle"; as evidence of Hoitt's "motive in resisting arrest and in
assaulting" the peace officer, and finally it was admissible as same transaction contextual evidence
showing that Hoitt's actions were part of a continuing criminal transaction. Id. (8)

 Although the trial court in the instant case did not announce its determination as to which
grounds under which it admitted Nicole's testimony about Hester's actions toward her, we cannot say
that admission of the evidence was an abuse of discretion. Hester began his evening's criminal
outbursts at Nicole's residence; he followed her to the Stover residence, where he appeared to engage
in some degree of disagreement (if not altercation) with Stover; Hester then purposely damaged a
significant amount of property in and around Stover's house. These activities, taken together, all led
up to the conduct for which Hester was on trial: aggravated assault upon law enforcement officers. 
We find evidence of Hester's assault on Nicole was admissible as same transaction contextual
evidence or as background contextual evidence. Based on the record before us, the trial court's
decision to permit Nicole's testimony was within the zone of reasonable disagreement. We overrule
Hester's first point of error. 

Prejudice/Probative Value; Rule 403 Review

 Hester next complains that Nicole's descriptions of Hester's acts toward her before the events
at the Stover home should not have been admitted because the probative value of the testimony was
substantially outweighed by the danger of unfair prejudice. See Tex. R. Evid. 403. When evidence
is found to be relevant, it still must be excluded if its probative value is substantially outweighed by
the danger of unfair prejudice. Tex. R. Evid. 403. When the trial court is called on to balance the
probative value against the potential prejudice of evidence of "other crimes, wrongs, or acts," a
presumption exists favoring the former. McFarland v. State, 845 S.W.2d 824, 837 (Tex. Crim. App.
1992); Barron v. State, 864 S.W.2d 189, 193 (Tex. App.--Texarkana 1993, no pet.). In other words,
this rule carries with it a presumption that relevant evidence will be more probative than prejudicial. 
Barron, 864 S.W.2d at 193 (citing Green v. State, 840 S.W.2d 394 (Tex. Crim. App. 1992)). In
evaluating the trial court's determination under Rule 403, a reviewing court is to reverse the trial
court's judgment "rarely and only after a clear abuse of discretion," recognizing that the trial court
is in a superior position vis-a-vis an appellate court to gauge the impact of the relevant evidence. 
Mozon v. State, 991 S.W.2d 841, 847 (Tex. Crim. App. 1999) (quoting Montgomery, 810 S.W.2d
at 389).

403 Analysis (9)

 The relevant criteria in determining whether the prejudice of an extraneous offense
substantially outweighs its probative value include:

 (1) how compellingly the extraneous offense evidence serves to make a fact of
consequence more or less probable--a factor which is related to the strength of the
evidence presented by the proponent to show the defendant in fact committed the
extraneous offense;

 

 (2) the potential the other offense evidence has to impress the jury "in some
irrational but nevertheless indelible way";

 

 (3) the time the proponent will need to develop the evidence, during which the
jury will be distracted from consideration of the indicted offense; [and]

 

 (4) the force of the proponent's need for this evidence to prove a fact of
consequence, i.e., does the proponent have other probative evidence available to him
to help establish this fact, and is this fact related to an issue in dispute.


Santellan v. State, 939 S.W.2d 155, 169 (Tex. Crim. App. 1997) (citing Montgomery, 810 S.W.2d
at 389-90) (footnote omitted).

How Compellingly Did Extraneous-Offense Evidence Serve to Make a Fact of Consequence
More or Less Probable?


 As previously stated, the evidence of Hester's confrontation and actions toward Nicole had
some relevance to the events that played out in the rest of the evening, events which led to assault
on public servant charges for which Hester was tried and convicted. It could be said that Hester's
actions with Nicole demonstrated a course of conduct and attitude of lawlessness that made it more
probable that Hester intentionally drove his vehicle in a dangerous manner when law enforcement
officers tried to detain him in the pasture. The apparent rage-filled conduct described by Nicole in
her testimony was similar to that demonstrated by Hester when he assaulted Stover on the front
porch, then used his truck to ram Stover's house and garage as well as Stover's automobiles and the
automobile driven by Nicole. All of this, along with the acts of Hester toward law enforcement
officers in the pasture, demonstrate a continuous pattern of outlandish behavior over a short period
of time. Although not argued specifically using this terminology, it could be said that Hester
basically asserted a defense of mistake where he claimed that he thought the persons shining
flashlights and firing weapons at him in the field were Stover and his friends and not peace officers. 
Evidence of Hester's crude, violent, and assaultive behavior toward Nicole and her children before
the events at the Stover property made it more probable that Hester acted intentionally when he
drove at officers in the pasture. This factor weighs in favor of admission of Nicole's testimony.

Potential the Other Offense Evidence Has to Impress the Jury "In Some Irrational but
Nevertheless Indelible Way"


 The jury saw a video recording made by a security camera at the Stover home which showed
Hester assault Stover and throw him to the ground. The same recording reveals that after Stover had
gone back into the house, Hester was seen kicking and pounding on the door and window, picking
up a folding chair and striking the door with it, and finally driving his vehicle through the front door. 
Another camera recording shows Hester apparently ramming his truck into the Stover garage and/or
Nicole's vehicle. Photographs were introduced showing the damage sustained from these acts,
including a set of glass doors which Hester evidently smashed with his vehicle, in addition to the
damaged front doors of the main house. Based on the vivid evidence showing the uncontrolled
violent nature of Hester's conduct at the Stover house, we cannot say Nicole's description of Hester's
conduct toward her and her children was likely to unduly impress the jury in an irrational, indelible
way. Also, Hester made no objection to Nicole's testimony describing Hester's cursing and berating
her when she called him earlier on in the day of the incident, wherein she sought his help when she
ran out of gasoline. She described him during that encounter as screaming profanities at her while
helping her get gasoline, following her to the gasoline station "literally within inches of [her]
bumper," and at the filling station honking his horn "like twenty or thirty seconds at a time." Her
description continued to relate that Hester had followed her to her office, where he threw her
business cards across her office and "had some choice words" before leaving. 

 Likewise, no objection was raised to the introduction of evidence relating to Hester's assault
on Stover. Greek mythology is that Athena sprang full grown from the brow of Zeus with a shout. 
To the jury, if the background of events on the fateful day was not traced from its commencement
to its denouement, there would be no context into which Hester's actions in the pasture which led
to these charges could logically be placed. In other words, Hester's actions would have appeared full
grown with no explanation of his motivations or his conduct before that time. 

 This factor weighs in favor of admission of the testimony.

Time State Took to Develop Extraneous Evidence

 Nicole was the State's first witness; her direct testimony elicited by the State consumes
approximately ten pages of the reporter's record. Less than three pages of Nicole's testimony are
used in describing the extraneous offenses. The State did not raise these extraneous acts in the
testimony of any other witness. When the State cross-examined Hester (a cross-examination which
lasts through about forty pages of the record), there were about three questions posed to him
regarding Nicole's allegations of wrongdoing directed by Hester toward her. In the State's closing
argument (which comprises about five pages in the reporter's record), there is only a brief eight-line
mention of the offenses against Nicole. The State made no reference to the incidents with Nicole
in its rebuttal closing argument. We find the State did not spend a significant portion of time
stressing Nicole's allegations; this factor weighs in favor of admission. 

State's Need for Extraneous-Offense Evidence

 This factor is the weakest in terms of supporting admission of Hester's conduct toward
Nicole. While we find the evidence of Hester's hitting, grabbing, and threatening Nicole relevant
in describing Hester's conduct in the continuum of events leading up to his assault on the law officers
in the pasture, it could be said that the State had some need (but not an overwhelming need) for this
evidence in order to place it in context for the jury. In making this observation, we note that the jury
was able to see some of Hester's aggressive and violent acts and the attitude he displayed in taking
those actions on the security video recordings at Stover's house and Hester disputed neither his
assault on Stover nor the damage he did to the various items of property that night. For the most
part, this factor weighs fairly evenly between admission of evidence of the extraneous acts and
exclusion of them; giving all factors their greatest weight to the benefit of Hester, there is a slight
balance in this weighing against admission of the evidence. 

 On the whole, and bearing in mind there is a presumption in favor of admission of relevant
testimony, (10) we do not find the probative value of the extraneous offenses was substantially
outweighed by the danger of unfair prejudice. The trial court did not abuse its discretion in
overruling Hester's Rule 403 objection; we overrule the second point of error. 

Sufficiency of the Evidence

 In his final point of error, Hester claims the evidence was both legally and factually
insufficient to support the jury's verdicts. (11) In reviewing the legal sufficiency of the evidence, we
view all of the evidence in the light most favorable to the verdict and determine whether any rational
trier of fact could have found the essential elements of the crime beyond a reasonable doubt. 
Jackson v. Virginia, 443 U.S. 307, 318-19 (1979); Johnson v. State, 23 S.W.3d 1, 7 (Tex. Crim.
App. 2000). In a factual sufficiency review, we review all the evidence, but do so in a neutral light
and determine whether the evidence supporting the verdict is so weak or is so outweighed by the
great weight and preponderance of the evidence that the jury's verdict is clearly wrong or manifestly
unjust. Lancon v. State, 253 S.W.3d 699, 705 (Tex. Crim. App. 2008); Roberts v. State, 220 S.W.3d
521, 524 (Tex. Crim. App. 2007).

 In this analysis, we use a hypothetically-correct jury charge to evaluate both the legal and
factual sufficiency of the evidence. Grotti v. State, 273 S.W.3d 273 (Tex. Crim. App. 2008). Such
a charge accurately sets out the law, is authorized by the indictment, does not unnecessarily increase
the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately
describes the particular offense for which the defendant was tried. Villarreal v. State, 286 S.W.3d
321 (Tex. Crim. App. 2009); Malik v. State, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997). Hester
does not assert any error in the charge given to the jury, and we find none. 

 In proving its case, the burden was on the State to prove that (1) Hester (2) intentionally or
knowingly (3) used or exhibited a deadly weapon (4) to threaten a person with imminent bodily
injury, (5) that person being one whom Hester knew to be a public servant (6) while the threatened
person was lawfully discharging an official duty. Tex. Penal Code Ann. §§ 22.01-.02 (Vernon
Supp. 2009). 

 We have summarized the evidence above. In addition to those highlighted pieces of
evidence, we point out that Hester admitted not only the damage done to the house and cars, but that
he was driving in the pasture. Hester acknowledged that a motor vehicle can be a deadly weapon
and acknowledged the men in the field that night were peace officers engaged in the lawful discharge
of their duties. His only defense is that he claims he was then unaware that the persons who were
chasing him in the pasture were law enforcement officers. He claimed that he thought, instead, that
it was Stover and two of his friends who were firing weapons at him. 

 Several witnesses said there were multiple police vehicles on the scene with their emergency
lights flashing. Some of these lighted vehicles can be seen in the video recordings from Officer
Head's in-car video camera which were played for the jury. Head estimated that fifteen to eighteen
law enforcement vehicles were on the scene, the "majority" of which had their emergency lights
flashing. In Head's words, as he ran through the pasture after Hester's vehicle, Head saw "a horizon
of red and blues. I mean it was obvious that, you know, that there was a lot of police officers out
there." Head also described the scene as an "ungodly amount of red and blue lights." Head saw
Hester's truck drive off the property (Hester stopped at one gate to allow it to open) on to a farm-to-market road. At that time, Head saw another police vehicle, with red and blue lights flashing, follow
Hester. Hester soon thereafter left the road and returned to the pasture. Officer Jones testified that
when he arrived at the scene, his emergency lights were turned on, as were the lights on several other
patrol cars. Jones drove into the field after Hester's vehicle; Jones said he never deactivated his
emergency lights. Jones also testified that Thacker, one of the named victims in the indictment, was
close behind Jones in Thacker's vehicle and that Thacker's vehicle had its emergency lights flashing. 
Hester's Suburban drove close by these two police vehicles; Jones estimated Hester's vehicle passed
within perhaps seven to ten yards of these police cars. Thacker said that the Suburban came within
ten to fifteen yards of the officers. Tipps said every police vehicle he saw at the scene had its
emergency lights activated. 

 Hester's claim of insufficient evidence is based on his assertion he did not know that it was
law enforcement officials who were at the scene; therefore, the defense argues that he lacked the
intent to assault or threaten the public servants. Intent may be inferred from acts, words, and conduct
of the accused. Hernandez v. State, 819 S.W.2d 806, 810 (Tex. Crim. App. 1991). The fact-finder
determines the weight to place on contradictory testimonial evidence because that determination
depends on the fact-finder's evaluation of credibility and demeanor. Cain v. State, 958 S.W.2d 404,
408-09 (Tex. Crim. App. 1997). As the determiner of the credibility of the witnesses, the fact-finder
may choose to believe all, some, or none of the testimony presented. Id. at 407 n.5. As an appellate
court, we may not reweigh the evidence or substitute our judgment for that of the fact-finder. King
v. State, 29 S.W.3d 556, 562 (Tex. Crim. App. 2000).

 A reasonable jury could have found, beyond a reasonable doubt, that Hester intentionally or
knowingly threatened Vasquez, Tipps, and Thacker with imminent bodily injury; that, contrary to
his assertions at trial, Hester did indeed know the three men were public servants lawfully
discharging their official duties; and that Hester used or exhibited a deadly weapon during this
assault. See Tex. Penal Code Ann. § 22.02(b)(2)(B). The evidence is legally sufficient to support
the jury's verdict. 

 We likewise find the evidence to be factually sufficient. In a factual sufficiency review, we
must take into consideration all of the evidence, not just that which supports the verdict. Each of
the officers who were named as victims in the indictment testified they were in close proximity to
Hester's vehicle when he drove at them at a speed that made the officers fear for their safety or lives. 
All of the officers described the distance from themselves to Hester in terms of spaces in the
courtroom (e.g., as close as where the prosecutor was standing, or not as far away as some doors to
the courtroom). Thacker did estimate Hester's Suburban came within ten to fifteen yards of the
officers. Each officer testified that they either shined a light at Hester's vehicle or that they saw a
light shined upon it, and that they called out to Hester, identifying themselves as law enforcement
officers and commanding him to stop. 

 The sole evidence which contradicts the jury's verdict in this case came from Hester alone. 
He claimed he did not know it was law enforcement officers attempting to stop him in the pasture
and claimed that he could not hear the officers calling out to him because his ramming of Stover's
house and vehicles had damaged the radiator of his vehicle, resulting in a loud screeching noise. 
Hester said the officers mistook that radiator noise for what they had described as the sounds of the
Suburban revving its engine and gathering speed before Hester approached them. Although Hester
did acknowledge seeing some emergency flashing lights, he said that he only saw those on the road,
away from the pasture. While he acknowledged seeing some flashlights or spotlights while in the
pasture, he said that those lights blinded him and he could not see any police or deputies. Hester
maintained throughout his testimony that he did not see any emergency lights actually in the pasture. 
We also point out that in the video recording from the camera in Officer Head's car, it shows Hester
passing within a few feet of at least two uniformed law enforcement officers. The clarity of this
video recording image undermines Hester's testimony that out in the dark pasture, with his headlights
disabled, he could not see the uniforms or badges of officers, as Head's video recording depicts a
well-lit area in front of Stover's front door. 

 While Hester presented his version of events, the jury had the opportunity to evaluate his
credibility and that of the testifying officers, and resolve any disputes in testimony. We can neither
say the jury's verdict is clearly wrong and manifestly unjust, nor that the verdict is contradicted by
the great weight and preponderance of the evidence. See Lancon, 253 S.W.3d at 705. We hold the
evidence is factually sufficient to support the verdict. We overrule Hester's third point of error. 

 We affirm the trial court's judgment.




 Bailey C. Moseley

 Justice


Date Submitted: November 24, 2009

Date Decided: December 8, 2009


Do Not Publish 

1. Tex. Penal Code Ann. § 22.02(b)(2)(B) (Vernon Supp. 2009).
2. Hester also pled guilty to two felony counts of criminal mischief. He does not challenge
those convictions, which we address in our opinion in cause number 06-09-00104-CR. 
3. At trial, Nicole identified herself with the surname Stover. She said she and Hester had been
married about two and a half years, and had divorced in the time between February 2008 and trial,
which was held in April 2009. 
4. When he testified, Hester denied hitting, grabbing, or threatening Nicole. 
5. Hester does not allege any error in his convictions for the two counts of criminal mischief,
but filed an appeal from the trial court judgments which resulted. We address those convictions in
our opinion issued on even date herewith in cause number 06-09-00104-CR. 
6. See Tex. R. Evid. 401: "'Relevant evidence' means evidence having any tendency to make
the existence of any fact that is of consequence to the determination of the action more probable or
less probable than it would be without the evidence." 
7. See Tex. R. Evid. 401.
8. See also Quincy v. State, No. 07-08-0386-CR; 2009 Tex. App. LEXIS 7645 (Tex.
App.--Amarillo Sept. 30, 2009, no pet. h.) (evidence of defendant beating and assaulting victim for
two hours or more before sexual assault--offense for which defendant charged and
convicted--admissible to show context of charged offense). 
9. As mentioned in our discussion of Hester's first point of error, the trial court said only that
it overruled each of Hester's objections. Although the Montgomery case does mandate that the trial
court conduct a Rule 403 balancing test if requested, the court does not have to conduct a formal
hearing or even announce on the record that it has mentally conducted this balancing test. Crivello
v. State, 4 S.W.3d 792, 797 (Tex. App.--Texarkana 1999, no pet.). A trial court is presumed to have
engaged in the required balancing test once Rule 403 is invoked. Williams v. State, 958 S.W.2d 186,
195-96 (Tex. Crim. App. 1997).
10. McFarland v. State, 845 S.W.2d 824, 837 (Tex. Crim. App. 1992). 
11. Strictly speaking, these present two distinct points of error. Nevertheless, we will address
his claims that the evidence is insufficient in the interest of justice. Gallo v. State, 239 S.W.3d 757,
770 n.6 (Tex. Crim. App. 2007).