

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-09-00103-CR

_____

ROBERT RAY HESTER A/K/A BOBBY HESTER, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 102nd Judicial District Court
Bowie County, Texas
Trial Court No. 08F0311-102

Before Morriss, C.J., Carter and Moseley, JJ.
Memorandum Opinion by Justice Moseley

MEMORANDUM OPINION

After having been convicted by a jury of three counts of the first-degree felony of aggravated assault on a public servant[1] and having been assessed a penalty of twenty-five years' imprisonment and a $7,000.00 fine on each count, Robert Ray Hester appeals. We affirm his convictions.[2]

**Factual Background**

The chain of events occurring on February 18, 2008, indicates that Hester experiences some difficulty with anger management. Hester and his wife, Nicole Stover,[3] were experiencing marital difficulties. Nicole had recently filed suit for divorce and on that day, Hester went to Nicole's workplace, where they quarreled. He then followed her home. Nicole described Hester's behavior at her home as "verbally abusive" and he had made "lewd gestures." Nicole told Hester she was taking her two children and leaving the house, but Hester told her she would not be leaving, and took a pizza planned for dinner and "shoved it all over" Nicole's ten-year-old son. Hester struck Nicole in the back and grabbed her crotch, squeezing and twisting it.[4] He then told her that he was going to kill her and the children. Testimony describing these last three acts by Hester drew objections at

[1]TEX. PENAL CODE ANN. § 22.02(b)(2)(B) (Vernon Supp. 2009).

[2]Hester also pled guilty to two felony counts of criminal mischief. He does not challenge those convictions, which we address in our opinion in cause number 06-09-00104-CR.

[3]At trial, Nicole identified herself with the surname Stover. She said she and Hester had been married about two and a half years, and had divorced in the time between February 2008 and trial, which was held in April 2009.

[4]When he testified, Hester denied hitting, grabbing, or threatening Nicole.

2

trial from Hester, the overruling of which form the bases of Hester's first two points of error. At one point during this confrontation, Nicole's son went into the kitchen and returned with a knife in his hand. After the child complied with Nicole's direction to put up the knife, Hester chased the boy around the house. During the chase, Hester's cell phone rang, and when he answered it, Nicole took the opportunity of the distraction and fled with the children from the house.

Nicole took the children to the house of her former husband, John Stover, who was also the father of Nicole's children. Two security camera video recordings from Stover's property were admitted into evidence and played for the jury. Hester was the star of these video recordings. In one, Hester can be observed on the edge of the picture screen, apparently urinating in a large flower pot or on the porch. It goes on to portray Hester attacking Stover and throwing him to the ground, attempting to beat or kick in the front door, and then finally driving his white sport utility vehicle (SUV) through the front doors of the house. In the other video recording, Hester's SUV is seen driving up the driveway; the SUV proceeds partially out of the frame of the picture and when it returns, the front end has been damaged and one headlight is no longer functional.

Wendy Farley, engaged to Stover at the time and present on the night of February 18, testified that the video recording depicted the part of the incident wherein Hester drove his SUV into the cars in Stover's garage. Photographs were admitted showing a damaged garage door and vehicles in the garage which had been damaged. At some point Hester also rammed the BMW automobile owned by Nicole's employer, which had been the vehicle Nicole drove from her house to Stover's house.

3

During this portion of the one-man riot, the occupants of Stover's house had reported the incident to law enforcement officers and at about this point during the incident, officers had begun to arrive. Bowie County Sheriff's Department officers arrived, as well as officers from the Texarkana, Texas, Police Department. Nathan Head, a Bowie County deputy, arrived at the scene; his in-vehicle camera recorded some of the activities. The very beginning of the video recording shows a large white SUV directly in front of Head's vehicle; as the recording progresses, the SUV pulls forward to face Head's patrol car and then pulls away. From Head's narration of the video recording at trial and pictures of Hester's SUV introduced into evidence, taken the next day in daylight, it appears that the large white SUV facing Head's video camera is Hester's SUV. In the video recording, the emergency lights on Head's vehicle can be seen clearly flashing while the SUV turns and drives away from Head. From a distance, Head's camera recorded Hester slamming into the garage and at least one vehicle. Later during the recording, Head's vehicle is parked near the front of Stover's house. Hester's white SUV can be seen driving past and officers moving quickly away. At that point in the recording, at least two law enforcement officers (from testimony at trial, the officers appear to be Head and Lieutenant Joe Vasquez, a Bowie County Sheriff's deputy) can be discerned near the Stover house. Within approximately a minute later, the recording shows Hester's SUV going past the camera's view a second time and at least one law enforcement vehicle can be seen approaching with emergency lights blinking distinctly.

4

Vasquez had arrived in his private vehicle, a vehicle which was not equipped with emergency lights. Vasquez testified that as he exited his vehicle, he heard Hester's SUV engine revving; he then saw the vehicle approach him at a high rate of speed, without lights. Vasquez shined both his flashlight and a light mounted on his pistol at the vehicle and shouted that he was with the sheriff's department and commanded the vehicle to stop. Vasquez had to jump out of the way to avoid being hit, and fired three shots toward the SUV's tires. Vasquez said at that time, he feared for his life, that of his partner, Head, and for the safety of the people in the house. Vasquez did say that at that point, he could not see emergency lights in the immediate area. A short time later, after Hester's SUV had crashed through a gate, Vasquez and other officers followed the SUV into an adjacent pasture. Hester once again drove toward the officers and Vasquez again fired at the SUV. At that point, Vasquez said there were law enforcement vehicles with emergency lights flashing within fifteen to twenty-five yards of Hester's vehicle.

Cody Tipps, a patrolman with the Texarkana, Texas, Police Department, had been chasing Hester's vehicle across the property and eventually rode into the pasture on the hood of a police car. The vehicle on which he rode had its emergency lights activated; Tipps said he saw several law enforcement vehicles on the road next to the pasture where Hester was located and that all those vehicles had emergency lights flashing. Hester's Suburban "made a pass at the patrol unit" upon which Tipps was sitting. Officers shouted they were police and commanded the driver of the vehicle to stop, but Hester drove off a ways into the pasture. When Tipps and the other officers approached

Hester's vehicle on foot, Hester turned the vehicle toward Tipps, Vasquez, and another Texarkana police officer, Brad Thacker. Tipps confirmed that Vasquez illuminated Hester's SUV with a flashlight and the light mounted on his pistol, and the officers again identified themselves, calling out for the driver of the vehicle to stop. Tipps and Thacker fired at the vehicle. Officer Michael Jones testified that he and Thacker drove their marked police cars into the pasture with the headlight emergency lights on; Hester drove his vehicle within seven to ten yards of the automobile driven by Jones. Tipps said he had "no doubt" at that point that the Suburban was going to run the officers over and Tipps feared for the officers' safety. Eventually, Hester's vehicle came to a stop, and he was placed under arrest.

**Hester's Appeal**

Hester pled guilty to two felony counts of criminal mischief (those concerning the damage caused by him to Stover's house, vehicles, and Nicole's vehicle).[5] He pled not guilty to the three counts of aggravated assault on public servants and the jury found him guilty, assessing the sentences to which he was eventually sentenced. Those convictions are the subject of the instant appeal.

**No Error in Admission of Extraneous-Offense Evidence**

Hester's first point of error complains that Nicole's testimony about the assaultive acts Hester took toward Nicole before the incidents in the pasture with law enforcement officers should have

---

[5]Hester does not allege any error in his convictions for the two counts of criminal mischief, but filed an appeal from the trial court judgments which resulted. We address those convictions in our opinion issued on even date herewith in cause number 06-09-00104-CR.

6

been excluded by the trial court. Hester initially claims evidence about his a) hitting Nicole in the back; b) grabbing, squeezing, and twisting her crotch area; and c) telling her he was going to kill her and her children was not "relevant to any contested issue"; however, his trial counsel did not make an objection to relevance.[6] Rather, when Nicole testified to the three instances cited above, on each occasion, Hester's trial counsel stated he objected "under 404b [sic] and 403." Each time, the trial court overruled the objection. Nonetheless, Hester's appellate argument is couched in terms of a complaint that admission of the testimony violated Rule 404(b), to-wit:

> Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided that upon timely request by the accused in a criminal case, reasonable notice is given in advance of trial of intent to introduce in the State's case-in-chief such evidence other than that arising in the same transaction.

TEX. R. EVID. 404. Hester's defense at trial centered on his contention that he was unaware that the persons in the pasture were law enforcement officers attempting to stop or confront him; accordingly, he maintains, he did not possess the intent to assault public servants. Thus, reasons Hester, evidence of any extraneous acts committed by him toward Nicole were not relevant to the offenses for which he was being tried.

---

[6]*See* TEX. R. EVID. 401: "'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."

The possible bases for admission of extraneous acts listed in Rule 404(b) are not exclusive or exhaustive. *Montgomery v. State*, 810 S.W.2d 372, 388 (Tex. Crim. App. 1990) (op. on reh'g). We employ an abuse of discretion standard when reviewing a trial court's decision to admit evidence. *Santellan v. State*, 939 S.W.2d 155, 168–69 (Tex. Crim. App. 1997). So long as the trial court's ruling was within the "zone of reasonable disagreement," we will not find an abuse of discretion and the trial court's ruling will be upheld. *Id*. at 169. In addition to the reasons for admissibility suggested in Rule 404(b), the Texas Court of Criminal Appeals has held that background evidence may be an "other purpose" for the admission of evidence and, if so, it is admissible under Rule 404(b). *Mayes v. State*, 816 S.W.2d 79, 86 (Tex. Crim. App. 1991). The Texas Court of Criminal Appeals has grouped background evidence into two categories: (1) same transaction contextual evidence and (2) background contextual evidence. *Id.* at 86–87; *Rogers v. State*, 853 S.W.2d 29, 32, 33 (Tex. Crim. App. 1993). Background evidence is admissible under Rule 404(b), where relevant under TEX. R. EVID. 401. *Rogers*, 853 S.W.2d at 32. If relevant, then the issue is whether the background evidence should be admitted as an "other purpose" under Rule 404(b). *Id*.

Same transaction contextual evidence is admissible where "several crimes are intermixed, or blended with one another, or connected so that they form an indivisible criminal transaction, and full proof by testimony, whether direct or circumstantial, of any one of them cannot be given without showing the others." *Mayes*, 816 S.W.2d at 86–87 n.4. Same transaction contextual evidence should only be admitted to the extent that it is necessary to the jury's understanding of the offense or when

8

the facts and circumstances of the offense would make little or no sense without also bringing in this evidence. *England v. State*, 887 S.W.2d 902, 915 (Tex. Crim. App. 1994); *Rogers*, 853 S.W.2d at 33. Background evidence is admissible under Rule 404(b), where relevant under Rule 401 of the Texas Rules of Evidence.[7] *Rogers*, 853 S.W.2d at 32. If relevant, then the issue is whether the background evidence should be admitted as an "other purpose" under Rule 404(b). *Id.* Background contextual evidence "fill[s] in the background of the narrative and give[s] it interest, color, and lifelikeness." *Mayes*, 816 S.W.2d at 87. In other words, the series of events which took place that night constituted an uninterrupted continuum of conduct which was, in essence, a single event. This type of evidence is admitted because of the "salutary effects it has on the jury's comprehension of the offense in question" and not out of necessity but out of judicial grace. *Id.* However, "propensity" evidence, i.e., character evidence that tends to prove that an accused acted in conformity therewith, offered as background contextual evidence, is not admissible because the rationale behind admitting such evidence—that it is "helpful to a jury"—is not an "other purpose" under Rule 404(b). *Id.* at 88.

Hester also complains the trial court did not enunciate its reasons for overruling Hester's objections to Nicole's testimony. Despite this complaint, Hester acknowledges this Court's language in *Grider v. State*, wherein we pointed out that although a trial court's explanation of its reasoning employed when determining that an extraneous offense is relevant apart from character conformity or a finding that the probative value is not substantially outweighed by potential for prejudice, it

---

[7]*See* TEX. R. EVID. 401.

"would be helpful in reviewing such decisions, [but] it is not required." *Grider v. State*, 69 S.W.3d 681, 688 (Tex. App.—Texarkana 2002, no pet.) (citing *Montgomery*, 810 S.W.2d at 397). Hester indicates, however, that we should distinguish *Grider* because in that case, the trial court specifically said the evidence in question was relevant "for the limited purposes of establishing motive, intent, and system, and to rebut Grider's defensive theory," *id.*, whereas, in the instant case, the trial court offered no explanation at all for admitting Nicole's testimony. One should take into account that a trial court's evidentiary ruling must be upheld on appeal if it is "reasonably supported by the record and is correct under any applicable theory of law . . . [and] even when the trial court gives the wrong reason for its decision." *Carter v. State*, 145 S.W.3d 702, 707 (Tex. App.—Dallas 2004, pet. ref'd) (citing *Romero v. State*, 800 S.W.2d 539, 543 (Tex. Crim. App. 1990)). It would be counterintuitive to sustain such a ruling when a court announces an incorrect reasoning for its rulings but finds error when no reason is expressed. Therefore, the same rule for review holds true where the trial court gives no reason for its ruling. *Hughes v. State*, 24 S.W.3d 833, 840 n.4 (Tex. Crim. App. 2000) (trial court gave no reason for overruling motion to suppress); *State v. Shastid*, 940 S.W.2d 405, 406–08 (Tex. App.—Fort Worth 1997, no pet.) (trial court gave no reason for granting defendant's pretrial habeas writ); *McDonald v. State*, 911 S.W.2d 798, 801 (Tex. App.—San Antonio 1995, pet. dism'd) (trial court gave no reason for excluding defendant's expert witness testimony). We find no error in the trial court's lack of explicit reason for overruling Hester's objections.

In *Hoitt v. State*, 28 S.W.3d 162, 169 (Tex. App.—Texarkana 2000), *pet. dism'd, improvidently granted*, 65 S.W.3d 59 (Tex. Crim. App. 2001), the appellant was charged and convicted of assault on a public servant. Hoitt first assaulted one person and demanded keys to his vehicle; after this unsuccessful attempt, Hoitt then went to a neighboring house and made similar demand for car keys to the neighbor's automobile. Authorities arrived; after a struggle and two chases, Hoitt hit and kicked one of the officers. This Court found that evidence of the assault against the first person and Hoitt's attempt to steal his vehicle was admissible to show the defendant's "motive, intent, and plan to steal a vehicle"; as evidence of Hoitt's "motive in resisting arrest and in assaulting" the peace officer, and finally it was admissible as same transaction contextual evidence showing that Hoitt's actions were part of a continuing criminal transaction. *Id.*[8]

Although the trial court in the instant case did not announce its determination as to which grounds under which it admitted Nicole's testimony about Hester's actions toward her, we cannot say that admission of the evidence was an abuse of discretion. Hester began his evening's criminal outbursts at Nicole's residence; he followed her to the Stover residence, where he appeared to engage in some degree of disagreement (if not altercation) with Stover; Hester then purposely damaged a significant amount of property in and around Stover's house. These activities, taken together, all led up to the conduct for which Hester was on trial: aggravated assault upon law enforcement officers.

---

[8]*See also Quincy v. State*, No. 07-08-0386-CR; 2009 Tex. App. LEXIS 7645 (Tex. App.—Amarillo Sept. 30, 2009, no pet. h.) (evidence of defendant beating and assaulting victim for two hours or more before sexual assault—offense for which defendant charged and convicted—admissible to show context of charged offense).

11

We find evidence of Hester's assault on Nicole was admissible as same transaction contextual evidence or as background contextual evidence. Based on the record before us, the trial court's decision to permit Nicole's testimony was within the zone of reasonable disagreement. We overrule Hester's first point of error.

**Prejudice/Probative Value; Rule 403 Review**

Hester next complains that Nicole's descriptions of Hester's acts toward her before the events at the Stover home should not have been admitted because the probative value of the testimony was substantially outweighed by the danger of unfair prejudice. *See* TEX. R. EVID. 403. When evidence is found to be relevant, it still must be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. TEX. R. EVID. 403. When the trial court is called on to balance the probative value against the potential prejudice of evidence of "other crimes, wrongs, or acts," a presumption exists favoring the former. *McFarland v. State*, 845 S.W.2d 824, 837 (Tex. Crim. App. 1992); *Barron v. State*, 864 S.W.2d 189, 193 (Tex. App.—Texarkana 1993, no pet.). In other words, this rule carries with it a presumption that relevant evidence will be more probative than prejudicial. *Barron*, 864 S.W.2d at 193 (citing *Green v. State*, 840 S.W.2d 394 (Tex. Crim. App. 1992)). In evaluating the trial court's determination under Rule 403, a reviewing court is to reverse the trial court's judgment "rarely and only after a clear abuse of discretion," recognizing that the trial court is in a superior position vis-a-vis an appellate court to gauge the impact of the relevant evidence.

12

*Mozon v. State*, 991 S.W.2d 841, 847 (Tex. Crim. App. 1999) (quoting *Montgomery*, 810 S.W.2d at 389).

**403 Analysis**[9]

The relevant criteria in determining whether the prejudice of an extraneous offense substantially outweighs its probative value include:

(1)   how compellingly the extraneous offense evidence serves to make a fact of consequence more or less probable--a factor which is related to the strength of the evidence presented by the proponent to show the defendant in fact committed the extraneous offense;

(2)   the potential the other offense evidence has to impress the jury "in some irrational but nevertheless indelible way";

(3)   the time the proponent will need to develop the evidence, during which the jury will be distracted from consideration of the indicted offense; [and]

(4)   the force of the proponent's need for this evidence to prove a fact of consequence, i.e., does the proponent have other probative evidence available to him to help establish this fact, and is this fact related to an issue in dispute.

*Santellan v. State*, 939 S.W.2d 155, 169 (Tex. Crim. App. 1997) (citing *Montgomery*, 810 S.W.2d at 389–90) (footnote omitted).

---

[9]As mentioned in our discussion of Hester's first point of error, the trial court said only that it overruled each of Hester's objections. Although the *Montgomery* case does mandate that the trial court conduct a Rule 403 balancing test if requested, the court does not have to conduct a formal hearing or even announce on the record that it has mentally conducted this balancing test. *Crivello v. State*, 4 S.W.3d 792, 797 (Tex. App.—Texarkana 1999, no pet.). A trial court is presumed to have engaged in the required balancing test once Rule 403 is invoked. *Williams v. State*, 958 S.W.2d 186, 195–96 (Tex. Crim. App. 1997).

**How Compellingly Did Extraneous-Offense Evidence Serve to Make a Fact of Consequence More or Less Probable?**

As previously stated, the evidence of Hester's confrontation and actions toward Nicole had some relevance to the events that played out in the rest of the evening, events which led to assault on public servant charges for which Hester was tried and convicted. It could be said that Hester's actions with Nicole demonstrated a course of conduct and attitude of lawlessness that made it more probable that Hester intentionally drove his vehicle in a dangerous manner when law enforcement officers tried to detain him in the pasture. The apparent rage-filled conduct described by Nicole in her testimony was similar to that demonstrated by Hester when he assaulted Stover on the front porch, then used his truck to ram Stover's house and garage as well as Stover's automobiles and the automobile driven by Nicole. All of this, along with the acts of Hester toward law enforcement officers in the pasture, demonstrate a continuous pattern of outlandish behavior over a short period of time. Although not argued specifically using this terminology, it could be said that Hester basically asserted a defense of mistake where he claimed that he thought the persons shining flashlights and firing weapons at him in the field were Stover and his friends and not peace officers. Evidence of Hester's crude, violent, and assaultive behavior toward Nicole and her children before the events at the Stover property made it more probable that Hester acted intentionally when he drove at officers in the pasture. This factor weighs in favor of admission of Nicole's testimony.

14

**Potential the Other Offense Evidence Has to Impress the Jury "In Some Irrational but Nevertheless Indelible Way"**

The jury saw a video recording made by a security camera at the Stover home which showed Hester assault Stover and throw him to the ground. The same recording reveals that after Stover had gone back into the house, Hester was seen kicking and pounding on the door and window, picking up a folding chair and striking the door with it, and finally driving his vehicle through the front door. Another camera recording shows Hester apparently ramming his truck into the Stover garage and/or Nicole's vehicle. Photographs were introduced showing the damage sustained from these acts, including a set of glass doors which Hester evidently smashed with his vehicle, in addition to the damaged front doors of the main house. Based on the vivid evidence showing the uncontrolled violent nature of Hester's conduct at the Stover house, we cannot say Nicole's description of Hester's conduct toward her and her children was likely to unduly impress the jury in an irrational, indelible way. Also, Hester made no objection to Nicole's testimony describing Hester's cursing and berating her when she called him earlier on in the day of the incident, wherein she sought his help when she ran out of gasoline. She described him during that encounter as screaming profanities at her while helping her get gasoline, following her to the gasoline station "literally within inches of [her] bumper," and at the filling station honking his horn "like twenty or thirty seconds at a time." Her description continued to relate that Hester had followed her to her office, where he threw her business cards across her office and "had some choice words" before leaving.

15

Likewise, no objection was raised to the introduction of evidence relating to Hester's assault on Stover. Greek mythology is that Athena sprang full grown from the brow of Zeus with a shout. To the jury, if the background of events on the fateful day was not traced from its commencement to its denouement, there would be no context into which Hester's actions in the pasture which led to these charges could logically be placed. In other words, Hester's actions would have appeared full grown with no explanation of his motivations or his conduct before that time.

This factor weighs in favor of admission of the testimony.

**Time State Took to Develop Extraneous Evidence**

Nicole was the State's first witness; her direct testimony elicited by the State consumes approximately ten pages of the reporter's record. Less than three pages of Nicole's testimony are used in describing the extraneous offenses. The State did not raise these extraneous acts in the testimony of any other witness. When the State cross-examined Hester (a cross-examination which lasts through about forty pages of the record), there were about three questions posed to him regarding Nicole's allegations of wrongdoing directed by Hester toward her. In the State's closing argument (which comprises about five pages in the reporter's record), there is only a brief eight-line mention of the offenses against Nicole. The State made no reference to the incidents with Nicole in its rebuttal closing argument. We find the State did not spend a significant portion of time stressing Nicole's allegations; this factor weighs in favor of admission.

16

**State's Need for Extraneous-Offense Evidence**

This factor is the weakest in terms of supporting admission of Hester's conduct toward Nicole. While we find the evidence of Hester's hitting, grabbing, and threatening Nicole relevant in describing Hester's conduct in the continuum of events leading up to his assault on the law officers in the pasture, it could be said that the State had some need (but not an overwhelming need) for this evidence in order to place it in context for the jury. In making this observation, we note that the jury was able to see some of Hester's aggressive and violent acts and the attitude he displayed in taking those actions on the security video recordings at Stover's house and Hester disputed neither his assault on Stover nor the damage he did to the various items of property that night. For the most part, this factor weighs fairly evenly between admission of evidence of the extraneous acts and exclusion of them; giving all factors their greatest weight to the benefit of Hester, there is a slight balance in this weighing against admission of the evidence.

On the whole, and bearing in mind there is a presumption in favor of admission of relevant testimony,[10] we do not find the probative value of the extraneous offenses was substantially outweighed by the danger of unfair prejudice. The trial court did not abuse its discretion in overruling Hester's Rule 403 objection; we overrule the second point of error.

---

[10]*McFarland v. State*, 845 S.W.2d 824, 837 (Tex. Crim. App. 1992).

**Sufficiency of the Evidence**

In his final point of error, Hester claims the evidence was both legally and factually insufficient to support the jury's verdicts.[11] In reviewing the legal sufficiency of the evidence, we view all of the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 318–19 (1979); *Johnson v. State*, 23 S.W.3d 1, 7 (Tex. Crim. App. 2000). In a factual sufficiency review, we review all the evidence, but do so in a neutral light and determine whether the evidence supporting the verdict is so weak or is so outweighed by the great weight and preponderance of the evidence that the jury's verdict is clearly wrong or manifestly unjust. *Lancon v. State*, 253 S.W.3d 699, 705 (Tex. Crim. App. 2008); *Roberts v. State*, 220 S.W.3d 521, 524 (Tex. Crim. App. 2007).

In this analysis, we use a hypothetically-correct jury charge to evaluate both the legal and factual sufficiency of the evidence. *Grotti v. State*, 273 S.W.3d 273 (Tex. Crim. App. 2008). Such a charge accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried. *Villarreal v. State*, 286 S.W.3d

---

[11]Strictly speaking, these present two distinct points of error. Nevertheless, we will address his claims that the evidence is insufficient in the interest of justice. *Gallo v. State*, 239 S.W.3d 757, 770 n.6 (Tex. Crim. App. 2007).

18

321 (Tex. Crim. App. 2009); *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997). Hester does not assert any error in the charge given to the jury, and we find none.

In proving its case, the burden was on the State to prove that (1) Hester (2) intentionally or knowingly (3) used or exhibited a deadly weapon (4) to threaten a person with imminent bodily injury, (5) that person being one whom Hester knew to be a public servant (6) while the threatened person was lawfully discharging an official duty. TEX. PENAL CODE ANN. §§ 22.01–.02 (Vernon Supp. 2009).

We have summarized the evidence above. In addition to those highlighted pieces of evidence, we point out that Hester admitted not only the damage done to the house and cars, but that he was driving in the pasture. Hester acknowledged that a motor vehicle can be a deadly weapon and acknowledged the men in the field that night were peace officers engaged in the lawful discharge of their duties. His only defense is that he claims he was then unaware that the persons who were chasing him in the pasture were law enforcement officers. He claimed that he thought, instead, that it was Stover and two of his friends who were firing weapons at him.

Several witnesses said there were multiple police vehicles on the scene with their emergency lights flashing. Some of these lighted vehicles can be seen in the video recordings from Officer Head's in-car video camera which were played for the jury. Head estimated that fifteen to eighteen law enforcement vehicles were on the scene, the "majority" of which had their emergency lights flashing. In Head's words, as he ran through the pasture after Hester's vehicle, Head saw "a horizon

19

of red and blues. I mean it was obvious that, you know, that there was a lot of police officers out there." Head also described the scene as an "ungodly amount of red and blue lights." Head saw Hester's truck drive off the property (Hester stopped at one gate to allow it to open) on to a farm-to-market road. At that time, Head saw another police vehicle, with red and blue lights flashing, follow Hester. Hester soon thereafter left the road and returned to the pasture. Officer Jones testified that when he arrived at the scene, his emergency lights were turned on, as were the lights on several other patrol cars. Jones drove into the field after Hester's vehicle; Jones said he never deactivated his emergency lights. Jones also testified that Thacker, one of the named victims in the indictment, was close behind Jones in Thacker's vehicle and that Thacker's vehicle had its emergency lights flashing. Hester's Suburban drove close by these two police vehicles; Jones estimated Hester's vehicle passed within perhaps seven to ten yards of these police cars. Thacker said that the Suburban came within ten to fifteen yards of the officers. Tipps said every police vehicle he saw at the scene had its emergency lights activated.

Hester's claim of insufficient evidence is based on his assertion he did not know that it was law enforcement officials who were at the scene; therefore, the defense argues that he lacked the intent to assault or threaten the public servants. Intent may be inferred from acts, words, and conduct of the accused. *Hernandez v. State*, 819 S.W.2d 806, 810 (Tex. Crim. App. 1991). The fact-finder determines the weight to place on contradictory testimonial evidence because that determination depends on the fact-finder's evaluation of credibility and demeanor. *Cain v. State*, 958 S.W.2d 404,

20

408–09 (Tex. Crim. App. 1997). As the determiner of the credibility of the witnesses, the fact-finder may choose to believe all, some, or none of the testimony presented. *Id*. at 407 n.5. As an appellate court, we may not reweigh the evidence or substitute our judgment for that of the fact-finder. *King v. State*, 29 S.W.3d 556, 562 (Tex. Crim. App. 2000).

A reasonable jury could have found, beyond a reasonable doubt, that Hester intentionally or knowingly threatened Vasquez, Tipps, and Thacker with imminent bodily injury; that, contrary to his assertions at trial, Hester did indeed know the three men were public servants lawfully discharging their official duties; and that Hester used or exhibited a deadly weapon during this assault. *See* TEX. PENAL CODE ANN. § 22.02(b)(2)(B). The evidence is legally sufficient to support the jury's verdict.

We likewise find the evidence to be factually sufficient. In a factual sufficiency review, we must take into consideration all of the evidence, not just that which supports the verdict. Each of the officers who were named as victims in the indictment testified they were in close proximity to Hester's vehicle when he drove at them at a speed that made the officers fear for their safety or lives. All of the officers described the distance from themselves to Hester in terms of spaces in the courtroom (e.g., as close as where the prosecutor was standing, or not as far away as some doors to the courtroom). Thacker did estimate Hester's Suburban came within ten to fifteen yards of the officers. Each officer testified that they either shined a light at Hester's vehicle or that they saw a

21

light shined upon it, and that they called out to Hester, identifying themselves as law enforcement officers and commanding him to stop.

The sole evidence which contradicts the jury's verdict in this case came from Hester alone. He claimed he did not know it was law enforcement officers attempting to stop him in the pasture and claimed that he could not hear the officers calling out to him because his ramming of Stover's house and vehicles had damaged the radiator of his vehicle, resulting in a loud screeching noise. Hester said the officers mistook that radiator noise for what they had described as the sounds of the Suburban revving its engine and gathering speed before Hester approached them. Although Hester did acknowledge seeing some emergency flashing lights, he said that he only saw those on the road, away from the pasture. While he acknowledged seeing some flashlights or spotlights while in the pasture, he said that those lights blinded him and he could not see any police or deputies. Hester maintained throughout his testimony that he did not see any emergency lights actually in the pasture. We also point out that in the video recording from the camera in Officer Head's car, it shows Hester passing within a few feet of at least two uniformed law enforcement officers. The clarity of this video recording image undermines Hester's testimony that out in the dark pasture, with his headlights disabled, he could not see the uniforms or badges of officers, as Head's video recording depicts a well-lit area in front of Stover's front door.

While Hester presented his version of events, the jury had the opportunity to evaluate his credibility and that of the testifying officers, and resolve any disputes in testimony. We can neither

22

say the jury's verdict is clearly wrong and manifestly unjust, nor that the verdict is contradicted by the great weight and preponderance of the evidence. *See Lancon*, 253 S.W.3d at 705. We hold the evidence is factually sufficient to support the verdict. We overrule Hester's third point of error.

We affirm the trial court's judgment.

Bailey C. Moseley
Justice

Date Submitted:     November 24, 2009
Date Decided:       December 8, 2009

Do Not Publish