**Opinion issued October 4, 2012.**



In The

# Court of Appeals

For The

# First District of Texas

———————————

**NOS. 01-12-00106-CR**
**01-12-00107-CR**
**01-12-00108-CR**

———————————

**MIGUEL MALDONADO, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 300th Judicial District Court**
**Brazoria County, Texas**
**Trial Court Case No. 61283**

---

**MEMORANDUM OPINION**

In a single indictment, the State charged Miguel Maldonado with aggravated

sexual assault and two counts of aggravated kidnapping, all first-degree felony

offenses. *See* TEX. PENAL CODE ANN. §§ 20.04, 22.01(a) (West 2011). The jury found Maldonado guilty of all three offenses and assessed his punishment at thirty-five years' incarceration and a $10,000 fine. In his single issue on appeal, Maldonado contends that the trial court abused its discretion in admitting evidence that he had stabbed one of the complainants, D.S., in Harris County, before traveling to Brazoria County, the location of the charged crimes. Finding no error, we affirm.

## Background

D.S., a young single woman, lived near Austin, where she worked as a cocktail waitress at a men's club. She frequently returned to Houston to spend time with her family and her son, C., who was two years old. According to the visitation agreement with C.'s father, C. spent two weeks with one parent and then two weeks with the other parent.

In mid-December 2009, D.S. planned a trip to Pasadena to pick up C. for the holidays. Before leaving, she posted on her Facebook page about her plans and her interest in going out to a club after she arrived in Pasadena. The day before her trip, D.S. received a telephone call from Maldonado, a friend of her brother and her cousin's boyfriend. Maldonado had not initiated contact with D.S. before, and D.S. was surprised to hear from him. The next day, Maldonado posted a message

2

on D.S.'s Facebook page, inviting her to get together with him while she was in Pasadena.

After D.S. arrived at her mother's home, Maldonado called again, and D.S. agreed to help him shop for a Christmas present for her cousin. While they were out, they stopped for lunch. They conversed about drugs and came up with a plan to sell ecstasy at the club where D.S. worked.

D.S. spent much of the afternoon driving Maldonado to various locations so that he could obtain the narcotics. While riding in the car, Maldonado began to ask D.S. various questions of a sexual nature, suggesting that he sought the information to help him further his relationship with D.S.'s cousin. Eventually, D.S. drove Maldonado to his uncle's house and left to pick up her son.

D.S. took C. to her mother's house. She then went to collect the narcotics with Maldonado at an abandoned hospital in Pasadena. Maldonado went inside the hospital and came out with a bag, which he deposited in the trunk. D.S. drove Maldonado to his brother's house so that he could leave the drugs there. D.S. did not want to transport the narcotics with her son in the car, so Maldonado agreed to bring them to her in Austin the following week.

After this last errand, D.S. told Maldonado that she was ready to pick up her son and head back to Austin. She rejected Maldonado's request for a ride to Austin, but agreed to take him to his cousin's automotive shop in Pasadena. D.S.

stopped at her mother's house, put C. in his car seat, and drove to the shop. Maldonado asked her to pull the car behind the shop. When D.S. stopped the car, Maldonado asked her if she could show him her breasts and give him a kiss goodbye. She refused and, still sitting in the driver's seat, told him to get out of the car. He reached for the door, then turned around and lunged at her. She felt pressure on her stomach. At first she thought he had punched her, but soon realized he had stabbed her and she was bleeding. She pleaded with him to stop, but he stabbed her again in the stomach, then in the leg. She tried to prevent Maldonado from stabbing her in the neck by shielding it with her hand; he stabbed her ear, her face, and the back of her head, and then put the blade through her hand. Maldonado told her she was going to die and ordered her to get out of the car. D.S. refused to leave without her son and pleaded with Maldonado to take her to a clinic, reassuring him that she would not turn him in. When Maldonado eventually agreed to take her to a clinic, D.S., bleeding profusely from her wounds, got back in the driver's seat. As she drove, Maldonado continued to hold the knife so D.S. could see it, first pointing the blade at her and then backward toward C.

Maldonado ordered D.S. to "just drive." D.S. realized that he was not taking her to a clinic and ran a couple of red lights, which angered Maldonado. D.S. continued to plead with him to help her get medical attention and assured him that she would not tell anyone that he had injured her. Maldonado told her that he

4

would drive her to a hospital and ordered her to pull the car into a parking lot behind some warehouses near State Highway 288 in Pearland. There, Maldonado attempted to discard the knives he used to attack D.S. First, he tried to wipe the blood from the knives by scraping the blades against D.S.'s eyeglass case. As he dropped them on the ground, though, Maldonado saw two trucks pull into the lot. He quickly retrieved the knives, got into the driver's seat, pulled the car out of the lot, drove to the daycare behind the warehouses, and parked the car in an area shielded by the daycare's bus on one side and a boat on the other.

As D.S. reached for the car door and glanced back at her son, Maldonado, still fumbling with the knives, muttered that D.S. wouldn't be able to step two feet before he killed both her and her son. Maldonado also told D.S. that he had people watching her family in Pasadena and that he could have them killed simply by making a telephone call. Still in the car, Maldonado demanded that D.S. perform oral sex on him, but a stab wound near her jaw made her unable to open her mouth. Maldonado ordered D.S. to pull down her pants, then sexually assaulted her while sticking his fingers into her knife wounds and pulling her toward him, which caused her to lose more blood. D.S. tried to keep her son calm by patting his legs while Maldonado was assaulting her.

When Maldonado finished, he told D.S. to use her GPS to find a hospital nearby. D.S., who by then had lost a significant amount of blood and was in a

5

seriously weakened state, had trouble doing so. Eventually, Maldonado parked the car at the Silverlake Mall in Pearland and called 911. He told the operator that they had been robbed and his friend had been stabbed in the neck.

Two patrol officers arrived shortly after receiving the call. Officer R. Gonzalez began attending to D.S. D.S. first told Gonzalez that she had been robbed and stabbed, and Maldonado explained that D.S. had called him for help. Then, seeing that Maldonado was holding C., D.S. whispered to Gonzalez to get C. away from Maldonado, and she told him that Maldonado was her attacker. Maldonado protested that he had not done anything, which further aroused the officers' suspicions. Deputy Humbird, who was training with Officer Gonzalez, stayed with D.S. until the ambulance arrived while Officer Gonzalez detained Maldonado. During the pat-down, Gonzalez discovered Maldonado had a bag of marijuana in his sweater and booked him on a possession charge.

During her investigation of the scene, Detective P. Newsome found blood all over the inside of the car, including pools of coagulated blood in both front seats. She also noticed a knife lying on the driver's seat. Investigators found blood on the outside of Maldonado's clothes and on his undergarments. DNA testing identified it as D.S.'s blood.

## Discussion

### *Standard of Review*

Maldonado challenges the trial court's admission of evidence that he stabbed D.S. in Harris County after it found that the stabbing was part of the same criminal episode as the crimes charged in Brazoria County. "We review a trial court's decision to admit evidence over objection under an abuse-of-discretion standard and will not reverse that decision absent a clear abuse of discretion." *McCarty v. State*, 257 S.W.3d 238, 239 (Tex. Crim. App. 2008) (citing *Zuliani v. State*, 97 S.W.3d 589, 595 (Tex. Crim. App. 2003). "The trial court abuses its discretion when the decision lies outside the zone of reasonable disagreement." *Id.* (citing *Cantu v. State*, 842 S.W.2d 667, 682 (Tex. Crim. App. 1992)).

### *Analysis*

Same-transaction contextual evidence is admissible as an exception under Rule 404(b) where such evidence is necessary to the jury's understanding of the instant offense. *Rogers v. State*, 853 S.W.2d 29, 33 (Tex. Crim. App. 1993). It "results when an extraneous matter is so intertwined with the State's proof of the charged crime that avoiding reference to it would make the State's case incomplete or difficult to understand." *Prible v. State*, 175 S.W.3d 724, 732 (Tex. Crim. App. 2005); *see Wyatt v. State*, 23 S.W.3d 18, 25 (Tex. Crim. App. 2000) (quoting *Moreno v. State*, 721 S.W.2d 295, 301 (Tex. Crim. App. 1986)). The purpose of

7

admitting extraneous evidence as same-transaction contextual evidence is to put the charged offense in context. *Mayes v. State*, 816 S.W.2d 79, 86–87 (Tex. Crim. App. 1991); *Camacho v. State*, 864 S.W.2d 524. 532 (Tex. Crim. App. 1993); *Jones v. State*, 962 S.W.2d 158, 166 (Tex. App.—Fort Worth 1998, no pet.). "[E]vents do not occur in a vacuum, and the jury has a right to hear what happened immediately" before and after the commission of the charged act so that it may properly evaluate the evidence. *Wesbrook v. State*, 29 S.W.3d 103, 115 (Tex. Crim. App. 2000). Same-transaction contextual offense evidence is admissible only to the extent that it is necessary to the jury's understanding of the charged offense. *Devoe v. State*, 354 S.W.3d 457, 469 (Tex. Crim. App. 2011).

Whether the trial court could correctly admit evidence that Maldonado stabbed D.S. in Harris County depends on the substantive elements of the charged offenses that the State was required to prove in his Brazoria County case. A person commits kidnapping if he "intentionally or knowingly abducts another person with the intent to . . . (3) facilitate the commission of a felony or the flight after the attempt or commission of a felony; (4) inflict bodily injury on him or violate or abuse him sexually; [or] (5) terrorize him or a third person . . . ." TEX. PENAL CODE ANN. § 20.04(a)(3), (4), (5) (West 2011). A person also commits aggravated kidnapping if he "intentionally or knowingly abducts another person

8

and uses or exhibits a deadly weapon during the commission of the offense." *Id.* § 20.04(b).

Without evidence that Maldonado used the knife on D.S. and continued to threaten her with it, the State could not have adequately explained how D.S. and her son ended up in Brazoria County with Maldonado in the car. The evidence also sheds light on D.S.'s motivation for initially following Maldonado's lead in concealing the actual circumstances of the crime from the police and for failing to immediately identify Maldonado as the perpetrator. Maldonado's stabbing of D.S. in Harris County was so intertwined with the incidents that followed in Brazoria County that the jury's understanding of those crimes would have been obscured without that evidence. *See Taylor v. State*, 263 S.W.3d 304, 314 (Tex. App.— Houston [1st Dist.] 2007), *aff'd*, 268 S.W.3d 571 (Tex. Crim. App. 2008).

A person commits aggravated sexual assault if he intentionally or knowingly causes the sexual organ of another person, without that person's consent, to contact or penetrate the mouth, anus, or sexual organ of another person, including the actor, and by acts or words occurring in the presence of the victim threatens to cause death, serious bodily injury, or kidnapping of any person, or uses or exhibits a deadly weapon in the course of the same criminal episode. TEX. PENAL CODE ANN. §§ 22.021(a)(1)(A)(iii), (a)(2)(A)(iii), (a)(2)(A)(iv). For purposes of the aggravated sexual assault statute, the "criminal episode" "begins when the attacker

9

in any way restricts the victim's freedom of movement and it ends with the final release or escape of the victim from the attacker's control." *Cruz v. State*, 238 S.W.3d 389, 398 (Tex. App.—Houston [1st Dist.] 2006, pet. ref'd); *see Quincy v. State*, 304 S.W.3d 489, 497 (Tex. App.—Amarillo 2009, no pet.) Maldonado began restricting D.S.'s freedom of movement when he stabbed her repeatedly, then forced her to drive while still holding her under the threat of the knife. He manipulated her into continuing to drive by claiming that he would help her get to a clinic or hospital to obtain medical treatment for the wounds he had inflicted. The restriction did not end until the police officers arrived and D.S. was able to tell them the truth about Maldonado's attack and get her son to safety.

The evidence that Maldonado stabbed D.S. in Harris County was also necessary for the jury to decide whether the State had proved beyond a reasonable doubt that the sexual assault occurred in Brazoria County and met the legal definition of aggravated sexual assault. Maldonado testified in his own defense that he had consensual sex with D.S. before he stabbed her. The complainant's testimony concerning the stabbing, as well as other evidence that the stabbing occurred in Harris County before the assault—including the placement of D.S.'s wounds and the physical evidence showing the amount and location of D.S.'s blood found on Maldonado's clothing—was critical to a complete understanding of

the sequence and nature of events and whether Maldonado's testimony cast any reasonable doubt on the State's proof.

In addition to satisfying the requirements of Rule 404(b), extraneous evidence must also satisfy the balancing test of Rule 403. TEX. R. EVID. 403; *Nguyen v. State*, 177 S.W.3d 659, 668 (Tex. App.—Houston [1st Dist.] 2005, pet. ref'd). In our review, we defer to the trial court's determination that the probative value of the extraneous offense evidence outweighs its prejudicial effect. *Id.* at 667. "Generally, although a trial court must still perform a balancing test to see if the same transaction contextual evidence's probative value is substantially outweighed by its prejudicial effect, the prejudicial nature of contextual evidence rarely renders such evidence inadmissible, as long as it sets the stage for the jury's comprehension of the whole criminal transaction." *Swarb v. State*, 125 S.W.3d 672, 681 (Tex. App.—Houston [1st Dist.] 2003, pet. dism'd); *accord Quincy*, 304 S.W.3d at 502. Here, the evidence that Maldonado stabbed D.S. in Harris County proved part of the same criminal episode that included the aggravated sexual assault and was also necessary to a complete understanding of the aggravated kidnapping charges. We hold that the evidence of the Harris County stabbing was not substantially outweighed by any danger of unfair prejudice.

## Conclusion

We hold that the trial court acted within its discretion in admitting the evidence that Maldonado stabbed D.S. in Harris County before forcing her to drive, at knifepoint, to Brazoria County, where he committed the offenses at issue in this appeal. We therefore affirm the judgment of the trial court.


Jane Bland
Justice

Panel consists of Chief Justice Radack and Justices Bland and Huddle.

Do not publish. TEX. R. APP. P. 47.2(b).

12